No. 3–06–0669

Filed October 29, 2007.

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | |
|---|---|
| In re ESTATE OF THOMAS TALTY, Deceased (Helen Talty, Petitioner-Appellee v. William Talty, Respondent-Appellant). | ) ) ) ) ) ) ) ) ) ) |  Appeal from the Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois,<br><br>No. 01–P–371<br><br>Honorable<br>Herman Haase,<br>Judge, Presiding. |

JUSTICE WRIGHT delivered the opinion of the court

_____

Respondent, William Talty, appeals from multiple orders and judgments entered by the circuit court of Will County with regard to the probate estate of Thomas Talty, deceased. We affirm.

## I. BACKGROUND

Respondent, William Talty, and his brother, Thomas Talty, operated an incorporated automobile dealership in Morris, Illinois, for over 25 years. Thomas and William each owned 50% of the corporate stock. The dealership is located on two parcels of land: a 2.98-acre parcel owned by Thomas and William, and a 6.21-acre parcel held in a land trust owned by Thomas and William. The 2.98-acre parcel contains the dealership buildings and primary parking lot, and the 6.21-acre parcel is vacant except for approximately 18,600 square feet used for a dealership parking lot.

In December 1999, Thomas learned he was ill. On July 13, 2000, Thomas executed a will

naming his brother, William as executor. The will made specific bequests of farmland to William and a sister, and named Thomas's wife, Helen, as the sole residuary beneficiary of the estate. Thomas's estate included his ownership interests in the dealership and the real estate. Thomas's will gave William the right to purchase all of his shares of stock in the dealership, subject to certain conditions, which included: "The purchase price shall be determined by an independent appraiser approved by the Probate Court having jurisdiction over my estate. Said purchase shall be in accordance with such additional terms as approved by the court."

The will also gave William the right to purchase Thomas's interest in the 2.98-acre parcel and also in the land trust holding title to the 6.21-acre parcel, providing: "The purchase price of these parcels shall be the fair market value as determined by an appraiser approved by the Probate Court having jurisdiction over my estate."

On January 3, 2001, Thomas and William entered into a corporate stock redemption agreement, which provided, in relevant part:

> 5. PURCHASE OF SHARES UPON DEATH OF SHAREHOLDER. Upon the death of a shareholder (the deceased shareholder), the Company shall purchase, and the personal representative of the deceased shareholder shall sell, all of the shares of the deceased shareholder as follows:
>
>> 5.1 The price (the "purchase price") for the shares of a deceased shareholder shall be computed by dividing the value, determined in accordance with subsections 5.2 and 5.3, by all the outstanding shares of the Company and multiplying the quotient thereby obtained by the number of shares held by the deceased shareholder on the date of death.

5.2 ***[T]he fair market value of all shares outstanding on the Company records as of the date of the deceased shareholders's death shall be determined in accordance with generally accepted accounting principles by a certified public accountant agreed upon by the Company and the personal representative of the deceased shareholder's estate. In the event that they are unable to agree upon a CPA, a disinterested CPA shall be appointed by the probate court having jurisdiction over the deceased shareholder's estate. The computation of fair market value by the CPA under this paragraph shall be final and binding on all parties.

5.4 ***, the remaining shareholder agrees to purchase, and the executor of the deceased shareholder shall sell, all of the deceased shareholder's interest in the commercial real estate, consisting of 9.19 acres, more or less, upon which the Company dealership is located in Morris, Illinois. *** The purchase price shall be fair market value as determined by an impartial appraiser agreed upon by the executor and the purchasing shareholder. ***

***

13. Notice. *** Notwithstanding anything to the contrary in this Agreement, any notice, exercise of option, request or other communication required or desired shall be given to the spouse, heirs or legatees of a deceased shareholder shall be deemed to have been delivered when *** addressed to either (i) the personal representative or successor of the deceased shareholder or (ii) the deceased shareholder at his

address as shown on the books of the company.

Thomas died on May 27, 2001. The will was filed and a probate proceeding was opened in Will County on June 1, 2001. Letters of office issued to William.

On July 5, 2001, William, as executor of Thomas's will, entered into a memorandum of agreement with the corporation appointing Robert E. Gordon, CPA, to value the corporate shares of stock. Gordon served as both the corporation's accountant since 1974 and the personal accountant for Thomas and his wife, Helen Talty. Gordon was also the cousin of Thomas and William Talty. Gordon valued Thomas's 50% interest in the corporation at $628,900.

The same memorandum of agreement appointed Stanley D. Twait to appraise the real estate as recommended to William by his attorney, Robert White, who is now deceased. Twait valued Thomas's ownership interest in the real estate at $603,101.

By letter dated August 23, 2001, William's attorney notified Helen's attorney of the appraised values of the corporate stock by Gordon, the appraised value of the real estate by Twait, and the purchase prices for Thomas's shares in the corporation and real estate. The letter further notified Helen's counsel of an August 30, 2001, anticipated closing date for the sale of the stock and real estate. Helen's counsel received the letter on August 24, 2001, but did not read it until August 28, 2001, because he was away from the office.

On August 28, 2001, Helen's counsel immediately filed an emergency motion with the probate court seeking an order to restrain the closing of the corporate stock and the land. The motion included a comment that Helen's counsel previously contacted William's attorney regarding the status of the appraisals, but no imminent proposed closing date was disclosed.

On August 29, 2001, William received a letter via facsimile from General Motors stating the

-4-

corporation's franchise agreement would terminate on August 31, 2001. The letter referenced a potential request for an18-month extension, but the deadline to request an extension predated the letter by approximately four weeks.

On August 30, 2001, by agreement of the parties, the circuit court denied Helen's emergency motion, ordered the redemption of the corporate stock, and ordered the sale of the real estate to proceed on August 30, 2001, at the agreed appraised values. Pursuant to the agreed order, the stock redemption and real estate sales occurred and the proceeds were submitted to the probate estate.

On December 19, 2001, Helen filed a three-count petition to set aside the August 30, 2001, sales of the corporate stock and the real estate, and requested an order to remove and surcharge William as the executor. On June 28, 2005, a three-day trial on Helen's petition commenced. On July 12, 2005, the circuit court issued a written opinion and order finding Thomas knowingly waived any conflict of interest when Thomas appointed William as executor of his estate, but finding that William's actions as executor constituted bad faith and an abuse of discretion. As a result of these findings, the court removed William as executor, vacated the sale of Thomas's stock to the corporation, appointed appraisers for the stock and land, and awarded Helen attorney fees, costs, and expert witness fees for William's violation of his fiduciary duty. The court also ordered William forfeit all executor fees.

By order dated June 29, 2006, the court determined the fair market value of the real estate, as of the date of Thomas's death, as $2,700,100, and entered judgment in favor of the estate of Thomas Talty and against William in the amount of $769,562. The court further found the fair market value of Thomas's 50% share of the corporate stock as of the date of his death to be $1,154,100, and entered judgment in favor of the estate of Thomas Talty and against William in the sum of $525,100,

with credit given for $628,000 paid.

By order dated July 31, 2006, the circuit court ordered William to repay the estate for attorney fees and appraisal fees related to the litigation. The court also entered judgment against William in favor of the estate for lost rents from Thomas's share of the real estate for $547,006.14 as of July 20, 2006, and in the amount of $222,491.46 for Thomas's share of lost profits from the corporation.

The circuit court denied William's motion to reconsider on August 23, 2006. William timely appealed. We will include additional facts where relevant to our analysis of the issues raised on appeal.

## II. ANALYSIS

Respondent, William Talty, raises some 22 issues and subissues on appeal, most unsupported by citation to authority. Those issues and subissues can be organized and more efficiently discussed as five general contentions of error. First, William argues the circuit court erroneously granted Helen Talty's petition to set aside the sales of the corporate stock and the real estate. Second, William claims the circuit court erred in appointing new appraisers. Third, William submits the circuit court improperly removed him as executor. Fourth, William asserts the circuit court erroneously entered judgments against him for the difference between the sale prices received and the fair market values of the real estate and corporate stock, plus associated costs and attorney fees. Fifth, William argues the circuit court improperly granted a turnover order to Helen Talty. We examine each of the five general issues, together with their related subissues, *seriatim*.

## A. Set-Aside Order

William argues the circuit court erroneously granted Helen Talty's petition to set aside the

sale of the corporate stock and the real estate. The parties agree the terms of the stock redemption agreement supersede the terms of Thomas's will. William's brief states: "Though the trial court did not expressly state that the court believed the terms of the Thomas Talty will superceded the terms of the stock redemption agreement, it is clear from its rulings that the trial court erroneously and implicitly did so." William misconstrues the circuit court's ruling.

We find nothing in the circuit court's ruling to imply that the court did not agree the terms of the corporate stock redemption agreement superceded the will. Instead, the court found that William breached his fiduciary duty as executor under Thomas's will when he failed to make full disclosure to Helen as the sole beneficiary of Thomas's estate.

William asserts the circuit court lacked authority to set aside the sale of Thomas's stock because the corporate stock redemption agreement expressly precluded any challenge to the CPA's valuation. Again, we note, the court set aside the sale of Thomas's stock because the court found William breached his fiduciary duty as executor of Thomas's will. We conclude, even though the stock redemption agreement superceded the will, William cannot rely on the terms of the stock redemption agreement to violate his fiduciary obligation to Helen as executor of Thomas's will. Accordingly, we hold the circuit court did not err in setting aside the sale of Thomas's stock for breach of fiduciary duty and the exercise of bad faith.

William argues the circuit court improperly vacated the August 30, 2001, agreed order. Although the circuit court's order setting aside the sale of the corporate stock had the effect of nullifying the August 30, 2001, agreed order, the court did not vacate that order. In setting aside the sale, William contends, the circuit court improperly allowed Helen Talty to challenge the valuation of the corporation when the stock redemption agreement specifically prohibited her from challenging

the valuation. We reject this argument because the court set aside the sale of the corporate stock only because it found William breached his fiduciary duty as executor under Thomas's will.

William contends the circuit court improperly applied *In re Estate of Halas*, 209 Ill. App. 3d 333 (1991), to this case. In *Halas*, the court held, "Where a conflict of interest is approved or created by the testator, the fiduciary will not be held liable for his conduct unless the fiduciary has acted dishonestly or in bad faith, or has abused his discretion." *Halas*, 209 Ill. App. 3d at 345. William argues *Halas* is inapplicable to this case because Helen waived her right to subsequently challenge the appraised value by agreeing to the August 31, 2001, order. Although Helen agreed to the August 31, 2001, order, that agreement was based on information, subsequently discovered to be inaccurate. Helen's agreement to allow the transactions to go forward did not affect her right to subsequently challenge William's actions as executor of Thomas's estate. In this case, the trial court found that William acted in bad faith in fulfilling his fiduciary duty as executor of Thomas's estate.

Clearly, Thomas trusted his brother and business partner to discharge his corporate duties and his duties as executor in good faith. We agree that the circuit court properly found Thomas waived any conflict of interest for William by placing William in multiple capacities as buyer, seller, and fiduciary. We observe that an executor can serve potentially conflicting interests without exercising bad faith as a fiduciary.

The ultimate issue in this case is whether the circuit court erred in finding William abused his discretion by acting in bad faith as executor of Thomas's estate. We will not reverse a trial court's factual findings of bad faith unless those findings are against the manifest weight of the evidence. *In re Estate of Lower*, 365 Ill. App. 3d 469, 478 (2006). "A determination will be found to be against the manifest weight of the evidence only when the opposite conclusion is clearly evident [citation]

or the determination is unreasonable, arbitrary, or not based on evidence presented." *In re D.F.*, 201 Ill. 2d 476, 498 (2002). "Under [the] manifest weight of the evidence standard, we give deference to the trial court as the finder of fact because [the trial court] is in the best position to observe the conduct and demeanor of the parties and the witnesses." *In re D.F.*, 201 Ill. 2d at 498-99. "A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *In re D.F.*, 201 Ill. 2d at 499.

An executor is appointed by the testator to carry out the dispositions made under the testator's will. *Greene v. First National Bank of Chicago*, 162 Ill. App. 3d 914, 921 (1987). The executor owes a fiduciary duty to both the testator's estate and the beneficiaries named in the will. *Greene*, 162 Ill. App. 3d at 921. The relationship between an executor and a beneficiary is that of trustee and *cestui que* trust. *Stoke v. Wheeler*, 391 Ill. 429, 434 (1945). As such, an executor owes a duty of full disclosure to the beneficiaries under the testator's will. See *Regnery v. Meyers*, 287 Ill. App. 3d 354, 363 (1997) ("a trustee owes the highest duty to his beneficiary to fully and completely disclose all material facts relating to dealings with the trust").

Here, the circuit court was particularly troubled that William exercised bad faith and breached his duty of full disclosure to Helen. We agree with the trial court's determination that William's failure to make full disclosure to Helen of the transactions relating to the sale of Thomas's corporate stock and Thomas's interest in the real estate constituted bad faith or an abuse of William's discretion as executor of Thomas's estate. William admitted he did not share any information with Helen regarding the estate's transactions, including the appraisals or the closing date for sale of both the corporate stock and Thomas's separate interest in the real estate. William claims all his

communication with Helen occurred through their respective attorneys. It is evident from the record that counsel for both parties had limited contact prior to the closing date.

William argues that the stock redemption agreement did not require him to disclose anything to Helen. While William may not have had a duty of disclosure to Helen under the corporate stock redemption agreement, he did have a separate duty of full disclosure to Helen as executor of Thomas's estate. We note the corporate stock was a part of that estate.

The court noted that William obtained a second appraisal of the real estate, the McConville appraisal, several months after closing on the sale of the real estate and failed to disclose that appraisal to Helen. The McConville appraisal indicated the fair market value of the land was substantially greater than the sale price. William admitted he did not provide a copy of the McConville appraisal to Helen, even though the estate was still open. It was obviously financially beneficial for William, as the purchaser of the real estate, to ignore the McConville appraisal to the detriment of Thomas's widow. It is inexplicable that the executor of an estate or his attorney would avoid disclosing a favorable appraisal to the sole beneficiary of the estate, unless there was a component of bad faith.

Not only did William fail to disclose the McConville appraisal to Helen or her counsel, William also continued to rely on the Twait real estate appraisal, which was unrealistically favorable to William's interest and diminished the value of Thomas's estate for Helen. Moreover, we agree with the trial court that William knew or reasonably should have known the Twait appraisal was unreasonably low, based on Twait's limited experience as a commercial real estate appraiser and the prime location of the real estate.

The circuit court further determined that William's decision to allow his cousin, Robert

Gordon, the corporation's CPA, to prepare a "revised" appraisal of the corporate stock valuing the stock at half the original appraisal after this litigation commenced constituted bad faith or an abuse of William's discretion as executor of Thomas's estate. We agree with the circuit court that this action supports a strong inference of bad faith and abuse of discretion.

Considering William's course of conduct, the court's finding of bad faith is justified. We cannot say the opposite conclusion is clearly evident or that the trial court's determination is unreasonable, arbitrary, or not based on evidence presented. *In re D.F.*, 201 Ill. 2d at 498. Accordingly, we conclude the trial court's finding that William acted in bad faith and abused his discretion as executor of Thomas's estate is not against the manifest weight of the evidence.

## B. Court-Appointed Business Appraiser

Defendant contends the circuit court erred in appointing a new CPA to value the business by completely disregarding the plain language of the corporate stock redemption agreement. The terms of the corporate redemption agreement provided that, in the event the corporation and the personal representative of the deceased shareholder's estate are unable to agree on a CPA to value the corporate stock, the probate court shall appoint a disinterested CPA to value the corporate stock. However, the probate court appointed a CPA after removing William as executor of Thomas's estate. Under these circumstances, it was not unreasonable for the court to eliminate any attempt to reach an agreement between the estate and William, as president of the corporation, since the court determined William improperly placed his interests above the estate's interest.

Additionally, William argues the new CPA selected by the court, John Rogers, was not "neutral," as required by the corporate stock redemption agreement, because Helen's attorney previously considered hiring Rogers to value the stock. However, Helen's counsel did not retain

Rogers.

William cites no authority requiring that any expert contacted by a party during litigation be disqualified from being appointed by the court. William's failure to cite relevant authority results in a waiver of this issue. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 493 (2002). Moreover, to recognize such a rule could easily result in abusive trial tactics where parties could contact particular experts with the intent of disqualifying them from serving the court. We find no support in the record to suggest Rogers was biased.

### C. Removal of Executor

William submits the circuit court improperly removed him as executor and failed to follow procedures for removal of an executor under the Probate Act of 1975 (755 ILCS 5/23–3 (West 2004)). Section 23-3 of the Probate Act provides that before removing an estate's representative, the court shall issue a citation directing the representative to show cause why he should not be removed. The executor may then file a responsive pleading and a hearing is held to determine whether the court should remove the executor. 755 ILCS 5/23-3(c) (West 2004). Although William claims he did not receive proper notice under section 23-3 of the Probate Act, he does not argue that he was prejudiced in any way, nor does he request that he be reinstated as executor. The record is clear that William received notice that Helen sought his removal as executor of her late husband's estate when she filed her petition with the court. Further, William answered Helen's petition and did not raise the issue of compliance with section 23-3 of the Probate Act. William has, therefore, waived this issue. See *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 750 (2001) (" 'Preservation of a question for review requires an appropriate objection in the court below [citation], and failure to object constitutes waiver.' *Williamsburg Village Owners' Ass'n v. Lauder Associates*, 200 Ill. App. 3d 474, 479*** (1990)").

Furthermore, William has not alleged or shown that he was prejudiced by the method he received notice of Helen's intent to have him removed as executor or that he was not given the opportunity to be heard on the issue. The error, if any, is harmless. *In re McMahon*, 221 Ill. App. 3d 383, 387 (1991).

## D. Surcharge of Executor

William asserts the circuit court erroneously entered judgments against him for the difference between the sale prices received and the fair market values of the real estate and corporate stock, plus associated costs and attorney fees. William claims the $525,100 judgment entered against him individually was erroneous because the corporation was obligated to purchase the shares. According to William, the court did not have the authority to enter judgment against him individually for an obligation belonging to the corporation. Although we agree that the stock repurchase agreement anticipated the corporation would purchase the shares of stock, William is the sole shareholder of the corporation and the only person who profited from his breach of fiduciary duty to Helen. The record shows that William, individually, and not the corporation, purchased the shares of stock from the estate. Accordingly, the circuit court properly held William personally liable for the difference between the purchase price and the fair market value of the stock.

William contends the $769,562 judgment entered against him was erroneous because the trial court did not expressly set aside the August 30, 2001, sale of the real estate. We disagree. As noted earlier, although the circuit court did not expressly vacate the August 30, 2001, order, the court's order had the effect of setting aside the sales. Here, the court simply held William accountable for the difference between what he paid for the real estate and its fair market value.

William claims the trial court erred in awarding lost rents and profits and that the court was

"double counting" damages. However, we note Thomas's estate was entitled to rents and profits prior to the August 30, 2001, sale of the real estate and stock. The judgments entered by the court for the difference between the actual purchase price and the more recent appraised values of the stock and land did not include lost rents and profits. The trial court set aside the sale of the stock, and Thomas's estate was, therefore, entitled to Thomas's share of the profits since August 30, 2001. Further, William was obligated to pay rent to Thomas's estate, as the co-owner of the land, until he satisfied the judgment because he had received all the rent from the corporation on the land.

William argues the court based damages for lost rents for the land on speculation or conjecture. Here, the record is clear that the corporation was paying each of William and Thomas $10,500 per month for rent, and computation of actual lost rents was accurately determined

William also contends the court based damages for lost corporate profits on speculation or conjecture. Although it is true that damages for lost profits cannot be based upon conjecture or sheer speculation (*Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 316 (1987)), it is not necessary that the amount of lost profits be proven with absolute certainty (*Vendo Co. v. Stoner*, 58 Ill. 2d 289, 310 (1974)). "Being merely prospective, such [lost] profits will, to some extent, be uncertain and incapable of calculation with mathematical precision. As such, '[a] recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty.' " *Midland Hotel Corp.*, 118 Ill. 2d at 315-16, quoting *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 289 (1917).

William argues that he was only given two weeks to review and refute the figures and that lost profits should not have been awarded. The trial court's assessment of lost profits was based on the evidence tendered to the court. William, the president and sole shareholder of the corporation during

the relevant time period for which lost profits were measured, did not introduce an alternative basis for the trial court to consider, nor does he assert any evidence on appeal to suggest the court's assessment was unfair. We cannot say that the court erred in relying on the calculation of lost profits provided by the estate's attorney.

William further complains the trial court erred in awarding punitive damages to Helen. Punitive damages are to be awarded only when a respondent's conduct is willful or outrageous due to evil motive or a reckless indifference to the rights of others. *Proctor v. Davis*, 291 Ill. App. 3d 265, 285 (1997). Whether punitive damages are available as a matter of law is an issue we review *de novo*. *Franz v. Calaco Development Corp*., 352 Ill. App. 3d 1129, 1137 (2004). A trial court's factual findings of willfulness or other aggravating factors will be reversed only when such findings are against the manifest weight of the evidence. *Franz*, 352 Ill. App. 3d at 1137-38. We will reverse a trial court's decision to award punitive damages based on those factual findings only if the court abused its discretion. *Franz*, 352 Ill. App. 3d at 1138.

Here, we conclude the trial court ordered William to pay Helen's attorney fees, costs, and expert witness fees for violating his fiduciary duty to Helen. Attorney fees and costs are an element of punitive damages. *Glass v. Burkett*, 64 Ill. App. 3d 676, 683-84 (1978). Such an award was clearly necessary to punish William for disregarding the rights of Helen as beneficiary under Thomas's will. Obviously, this punitive damage award inures to Helen's benefit. However, William does not cite any case law which holds that a beneficiary may not benefit from punitive damage awards. We reject this argument. Based on the record in this case, we cannot say the trial court abused its discretion in ordering William to pay Helen's attorney fees, costs, and expert witness fees to punish William's misconduct.

William next argues the trial court erred in assessing the administrator's fees, attorney fees, and costs because the court's award exceeded the customary fees and costs of routine estate administration. Again, William's argument is not supported by any authority and he has, therefore, waived the argument. Despite William's waiver, we cannot say that the trial court erred in assessing William for fees and costs incurred as a result of litigation resulting from his bad faith. William's conduct necessitated litigation, which otherwise would not have been necessary if William had acted in good faith as executor of Thomas's estate.

William complains that he was ordered to reimburse the estate for attorney fees and costs paid by the estate while William was executor. William contends that he pursued litigation in good faith and should not be personally liable for the estate's litigation expenses (see *McKay v. Riley*, 135 Ill. 586, 590 (1891)). However, when litigation is pursued for the benefit of the executor personally, and not for the benefit of the estate, the cost should be borne by the executor personally. See *Edwards v. Lane*, 331 Ill. 442, 451-52 (1928), citing *Felsenthal v. Kline*, 214 Ill. 121, 124 (1905). Accordingly, we find the trial court properly ordered William to reimburse the estate's attorney fees and costs incurred during his time as executor.

William contends that the trial court granted excessive attorney fees and costs because the fee petition for Helen's attorney fees, expenses, and expert fees did not meet the requirements under Illinois law. However, William does not specify the deficiencies in Helen's fee petition. A trial judge's familiarity with litigation permits the judge to independently evaluate the necessity and reasonableness of fees and services. See *Estate of Price v. Universal Casualty Co.*, 334 Ill. App. 3d 1010, 1015 (2002). Accordingly, without more specific direction as to how the fees and costs were excessive, the court's determination will stand.

William argues the trial court improperly found him in criminal contempt. The record does not support any reasonable argument that the court held William in criminal contempt. We find this argument unsupported and unworthy of further discussion.

## E. Turnover Order

William's final argument is that the trial court erred in granting a turnover order to Helen, requiring William's assets be turned over to Helen. William argues the judgment awards against him are not final, so they cannot be subject to supplementary proceedings. William seems to be arguing that because the judgments did not contain the words "final and enforceable," the orders were not final, yet he does not cite any authority for such an argument. As noted in the administrator's brief, upon William's filing of a proper appeal bond, the trial court ordered the garnishee to return to William the funds that had been garnished and the issue is, therefore, moot. Moreover, we note that if the orders and judgments were not final and enforceable, they would not be appealable.

## CONCLUSION

For the foregoing reasons, we affirm the orders and judgments of the circuit court of Will County.

Affirmed.

HOLDRIDGE and O'BRIEN, JJ., concur.