2021 IL App (2d) 190324-U
Nos. 2-19-0324 & 2-19-0775 cons.
Order filed June 22, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF DORIS WESTPHAL, a disabled person | ) ) ) ) ) | Appeal from the Circuit Court of Du Page County.<br><br>No. 16-P-361 |
| (Scott Westphal and Nancy Nicholas, Petitioners-Appellees, v. Pamela Nestel, Respondent-Appellant). | ) ) ) ) | Honorable Robert G. Gibson, Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in denying respondent's motion to compel answers to discovery and in limiting further discovery. Further, the trial court did not err in denying respondent's petition to remove the guardian of the estate and overruling her objection to the second accounting, because neither of those rulings were against the manifest weight of the evidence. Lastly, the trial court's awards of attorney fees were not an abuse of discretion or manifestly erroneous. Therefore, we affirm.

¶ 2    This case arises from protracted litigation among siblings in the administration of the guardianship of their mother. In this consolidated appeal, respondent, Pamela Nestel, argues that the trial court erred in ruling on several of her motions and petitions. Namely, she argues that the trial court erred in denying her motion to compel discovery, limiting further discovery, denying

her petition to remove the guardian of her mother's estate, overruling her objection to the second accounting for the estate, and awarding attorney fees. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On April 15, 2016, petitioners, Scott Westphal and Nancy Nicholas, filed their verified petition for adjudication of disability and for appointment of guardians. They respectively sought to be appointed as guardians of the estate and of the person of their mother, Doris Westphal. Doris, who was born in 1927, was living alone; her husband was deceased. Petitioners alleged that Doris was a person with a disability due to mental deterioration and physical incapacity that caused her to not be able to fully manage her person or estate. Along with Scott and Nancy, Doris's other two children were Bruce Westphal and respondent, Pamela. Scott was already named as Doris's agent under her power of attorney for property. On May 9, 2016, Pamela moved to strike, dismiss, or deny petitioners' verified petition.

¶ 5     On May 11, 2016, the trial court entered an order that, *inter alia*, appointed attorney Kathleen Paravola as Doris's guardian *ad litem* (GAL). The trial court directed her to interview Doris, inform her of the petition for adjudication of disability, and file a written report with the court.

¶ 6     Scott and Nancy filed a petition on June 16, 2016, to revoke powers of attorney and certain family trust documents. Specifically, they sought to revoke powers of attorney obtained by Pamela for Doris in July 2015 and March 2016.

¶ 7     The GAL filed a report on June 29, 2016. She reported that Doris was currently 88 years old and residing with Nancy. In May 2016, Doris was formally diagnosed with Alzheimer's disease and progressive and moderate dementia. She was taking medication for her Alzheimer's

disease. Her memory had been significantly deteriorating over the past year or so, and she was in need of assistance to manage her affairs. She was no longer driving.

¶ 8     The report continued that Scott believed that Pamela and Bruce were taking Doris to the ATM and bank to withdraw large sums of cash or write checks out to "cash," and then using the money for themselves. Credit card statements reflected large bills from expensive restaurants to which they took Doris. Scott also stated that his nephews used her credit card number to charge substantial purchases. He worried that his siblings were taking advantage of their mother.

¶ 9     Pamela claimed that the checks made out to "cash" were actually made by Scott and Nancy. Pamela was suspicious of Scott's handling of their mother's money, and she also believed that he was not investing her money well. Pamela and Bruce were both concerned that Scott had used their mother's money to pay $30,000 for his son's tuition. Scott stated that when Doris had learned that his son would be attending Carnegie Mellon, she was very proud and repeatedly said that she wanted to pay for it, and he had finally agreed that she could pay for one semester's tuition.

¶ 10    The GAL provided that, among Doris's children, "things came to a head around Christmas time last year." Ultimately, Pamela and Bruce were at odds with Scott and Nancy, especially over Scott's power of attorney. There were various accusations among the siblings without any resolution reached. The family attorney, Donna Cain, had attempted to mediate the matter.

¶ 11    The GAL described Doris as a "lovely elderly lady" with bright eyes and an engaging laugh. She was in good physical health for her age. Aside from her memory issues, she appeared to be intelligent and generally oriented, especially with regard to her family. Doris recognized that she was at a point where she needed help managing her affairs. When discussing how she felt about living with someone and having someone help with day-to-day living, she said that Nancy

took good care of her and that she would be fine living with Nancy. She indicated she would also be fine living with Bruce or Scott.

¶ 12    At all times, Doris was clear that Scott was her choice to handle her money and finances. He had been investing for her for a long time and she wished he would continue to do so. She explained that Scott's background was in finance and he had done quite well for himself. She did not specifically remember paying for Scott's son's education. However, she did seem to know that he was going to school, and when asked if giving money for her grandson's education might be something she would do, she said yes, explaining that her children's and grandchildren's educations were always important to her and her husband.

¶ 13    Doris did not remember granting Pamela power of attorney. She vaguely remembered her coming to her home with men she did not know, and she did not understand what she had signed. When the GAL explained that she had given Pamela power to make decisions about her money, she stated that was not what she wanted. When asked about a $7000 check taken from one of her accounts to pay for Pamela's attorney, she replied "why would I want to take money out of my account to pay her attorney to fight me?"

¶ 14    The GAL's conclusions and recommendations were as follows. There was a long history of resentment among the siblings over many issues, resulting in distrust. The primary dispute was not whether Doris needed assistance but instead over how much assistance she needed and who should be trusted to manage her money. Doris expressed agreement with Scott and Nancy that they should be appointed her legal guardians. Bruce and Pamela were contesting their appointment. The GAL believed that most cash gifts that Doris provided to her children were likely agreed to by her, although she had trouble with specific recollections. As to the tuition gift for Scott's son, that was in keeping with Doris's long-standing desire to assist her grandchildren with their education. The

allegations that Scott was not an appropriate trustee or guardian did not appear to have any basis in fact. Moreover, Pamela's actions in obtaining power of attorney for Doris and having her terminate her association with the longtime family attorney were "very troubling." It seemed very unlikely to the GAL that Doris would knowingly terminate Ms. Cain's services.

¶ 15    Next, the GAL disagreed with Pamela's assertions that her parents desired an equitable division of trust property among the children, because the family trust documents specifically provided for an equal division among the four children. Finally, the GAL believed that Nancy was the best choice as Doris's primary caregiver. She opined that it was in Doris's best interest that the trial court grant petitioners' request to appoint Nancy and Scott as guardians of Doris's person and estate, respectively.

¶ 16    The parties entered into a family settlement agreement (FSA) on or around October 5, 2016. On October 19, 2016, the trial court entered an agreed order finding that Doris was a disabled person and appointing Nancy and Scott as plenary guardians of Doris's person and estate, respectively. The agreed order also memorialized the entering of the FSA, and the trial court retained jurisdiction to enforce the terms of the FSA. As guardian of Doris's person, Nancy was to provide for reasonable visitation between Doris and other family members. As guardian of the estate, Scott was authorized to make expenditures pursuant to the budget provided in the FSA. The agreed order further provided that the budget for Doris's estate was to be approved annually on or around November 1.

¶ 17    On December 12, 2016, Scott filed an asset inventory for Doris, and Pamela objected to the accounting and inventory. On October 23, 2017, Scott and Nancy moved to approve the annual report of the guardian of the person, annual accounting of the guardian of the estate, and budget

for the estate for 2017-2018. Pamela objected separately to all three, and the trial court set an evidentiary hearing for March 14, 2018.

¶ 18    The evidentiary hearing did not take place on March 14, and instead the trial court entered an order that day requiring that Scott and Nancy produce information and documents, such as billing statements and updates on Doris's medical issues. Scott filed a report of the guardian of the estate on May 16, 2018.

¶ 19    On May 24, 2018, Pamela filed a petition for enforcement, for rule to show cause, for indirect civil contempt, and for removal of Scott as guardian of Doris's estate and as trustee of her living trust. In primary part, she argued that Scott had failed to comply with the trial court's March 14, 2018, order, in that he had failed to disclose all statements evidencing estate expenses.

¶ 20    On June 14, 2018, the trial court ordered that, *inter alia*, the parties were to complete discovery within 45 days or as otherwise agreed. It scheduled an evidentiary hearing for September 5, 2018, on the parties' open motions. In mid-July 2018, Pamela issued subpoenas to eight banks and financial institutions seeking documents related to Doris's accounts.

¶ 21    Also in July 2018, Pamela moved pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)) to strike Scott and Nancy's affirmative defenses to her May 24, 2018, petition. Scott and Nancy filed amended affirmative defenses to Pamela's petition, asserting that they had complied with the trial court's March 14, 2018, order, and that Pamela's relief should be denied under the equitable doctrine of unclean hands.

¶ 22    On August 13, 2018, the trial court entered an order that recommended that the parties engage a forensic accountant or other similar third-party service, as can be agreed, for the purpose of reviewing the accounting and making a report, with the cost born by the estate. It also struck

the scheduled evidentiary hearing and noted that counsel had informed it that discovery was progressing.

¶ 23    On September 21, 2018, Pamela filed two motions: one to appoint a forensic accountant and another to compel production of unredacted documents.

¶ 24    The trial court granted Pamela's request that Scott provide unredacted documents, and it continued her motion for a forensic accountant, pending the GAL's oral report on estate accounting and budgeting. Meanwhile, Pamela provided notice to produce to Scott and Nancy pursuant to Rule 214 (Ill. S. Ct. R. 214 (eff. July 1, 2018)). On February 1, 2019, she also moved to compel answers to discovery and filed notices for Scott's and Nancy's individual discovery depositions.

¶ 25                    A. GAL's Supplemental Report

¶ 26    The GAL provided the parties a supplemental report on February 14, 2019, which was later filed with the court. Therein, she recounted the back-and-forth litigation between the parties. The GAL observed that "[w]ithin a few months of the guardianship being entered, litigation over Doris's estate began and has snowballed into the above mire of pleadings and counter-pleadings," resulting in the trial court's request that she review estate financial records for any significant accounting abnormalities. The GAL continued that the issues raised by Pamela could be distilled into disputes over "accounting and expenditures of Doris's money, compliance with the FSA, visitation, and *** attorney's fees." On the other hand, Scott and Nancy asserted that they had complied with their obligations under the FSA, that Doris's estate had been properly administered, that the accountings were proper and complete, and that they had complied with visitation requirements. They claimed that they had been subjected to "a continuous campaign of harassment."

¶ 27    Summarizing the pre-annual report litigation, the GAL stated that Pamela had objected to the initial inventory based on the absence of certain personal property and Doris's car, and further objected that the inventory did not account for Doris's Fidelity IRA or Thrivent life insurance policy. Contrary to Pamela's objections, the GAL observed that the identified car was purchased and paid for by Scott prior to the FSA and guardianship; the initial inventory contained a detailed list of specific household items and personal property; and the last page of the inventory listed the Fidelity IRA account and Thrivent life insurance policy, in addition to a Bank of America checking account and the Wells Fargo/Schwab Living Trust Account.

¶ 28    With respect to Pamela's request for an on-going accounting of Doris's estate and assets, the GAL concluded that the FSA did not require that all expenses had to be detailed or have supporting documents provided, nor did it preclude Scott and Nancy from obtaining reimbursement from the estate for out-of-pocket expenses. Accordingly, nothing improper was shown simply because money from the estate was transferred to Scott's or Nancy's personal accounts. As to Pamela's requests for bank and credit card statements, the GAL was not privy to all documents provided on a quarterly basis, but the bank and trust brokerage statements she had received appeared to be complete hard copies, and the redactions were prudent and appropriate to protect account numbers and the consultant's contact information.

¶ 29    Moving to the guardians' annual accounting and budget, the GAL had reviewed various unredacted records, including credit card statements, bank statements, trust brokerage account statements, IRA statements, life insurance policy statements, real estate sale documents, and receipts for expenses ranging from groceries to furniture. She compared the withdrawals from the trust brokerage account and bank accounts with payments for expenses, invoices, and receipts, and she cross-referenced expenses and statements on both a monthly and a total basis. The period for

her review was October 2016 to November 2018. She also met with Pamela and her counsel to try to discern their specific alleged discrepancies or concerns.

¶ 30 Following her review, she believed she could reconcile all of Pamela's alleged discrepancies and concerns, such as verifying the amounts expended on Doris's home and explaining certain withdrawals from the trust brokerage account.

¶ 31 Next, the GAL addressed Pamela's allegations that Scott and Nancy violated their FSA disclosure obligations. The GAL reported that they had timely provided Pamela with relevant trust brokerage account statements, and whether any additional statements were required could be determined without further discovery.

¶ 32 In conclusion, the GAL did not find assets unaccounted for, nor did she see evidence that Scott was hiding assets from Doris's estate or trust. The GAL further noted that Pamela was not a co-guardian and was not entitled to an on-going accounting simply because she did not trust Scott. She conceded that a "small portion" of the pleadings raised valid concerns about whether FSA disclosure requirements were met pertaining to entertainment expenses and home sale expenditures and whether visitation had been properly permitted. She continued, however, that it was extremely difficult "to separate the wheat from the chaff," in that Pamela had raised numerous concerns and that even agreements to provide her more information than she was entitled to under the FSA did not satisfy her concerns.

¶ 33 The GAL opined that further discovery would not benefit Doris and that the trial court had enough information to determine whether reimbursements or fees were appropriate. She found it "distressing" that the family had spent over two years in litigation. She noted that Doris was in a "wonderful facility" and by all accounts doing well given her circumstances, but the tension and distrust among her children had contributed to "needless motions and petitions."

¶ 34　　　　　B. Hearing on Pamela's Motion to Compel Answers to Discovery

¶ 35　The court held a hearing on February 19, 2019, in which the GAL expounded her report. The GAL began that, although both sides have "lots of arguments *** based on her report," the report "says what it says." She was concerned that there had been a lot of litigation thus far and that it was not benefitting Doris. Doris was doing "okay" at 91 years old.

¶ 36　In response to Pamela's counsel's argument over disclosures and accounting, the GAL stated that she had reviewed the relevant financial statements and added up withdrawals for the relevant time periods. She believed that Pamela's counsel had the same financial statements that she had. Pamela's counsel disputed that he had all the documents the GAL had. He also argued that the GAL wrote her report based on her notes and not upon reviewing specific documents. The GAL responded that that was incorrect.

¶ 37　The GAL continued that the documents that she was referencing were documents provided to all counsel in 2017, which included statements from Doris's checking accounts, IRA, and life insurance policy. She also took exception to counsel's statement that "[t]he reason they don't want to produce [more documents] is because they don't want us to look at the documents and find discrepancies. Only reason." She asserted that the accounting stated how much was spent "and that was how much was spent." Whether every expenditure was reasonable was something that the trial court could question, but she had no doubt that the expenses indicated in the accounting were the expenses actually spent.

¶ 38　The trial court interjected that out of all the guardianship cases it had presided over, "this would be in the top few of level of dysfunction between siblings." The trial court was concerned with the well-being and best interest of Doris, and yet the litigation "just continues on." It

referenced the last court hearing where Pamela had to be removed from the courtroom, and even when she was told to leave, she refused, trying to stand in the back.

¶ 39    The trial court denied Pamela's motion to compel answers to discovery. It noted that the GAL "doesn't have an axe to grind about years or decades of problems between family members." She was the eyes and ears of the court, and she had said that enough was enough. In its written order, the trial court also stayed discovery until further order of the court. Pamela moved to reconsider the trial court's ruling.

¶ 40         C. Hearing on Motion to Reconsider, Removal Petition, and More

¶ 41    The trial court heard Pamela's motion to reconsider on March 22, 2019, where Pamela argued that the scope of discovery was supposed to be broad and that the trial court should have allowed her motion to compel Scott to turn over additional documents.

¶ 42    The GAL was present at the hearing with a large box of documents that she had received in connection with the first accounting, which she had brought "just in case." She informed the court that both sides had issued interrogatories and requests to admit, and both sides had responded to those. She believed most all documents and information, if not all, had been provided. She had spent substantial time in her supplemental report sorting out the discovery because it was a "jumble of different timelines." She stressed that while Pamela was asking for documents for every ongoing expense over the past several years, the only objections filed were to the first accounting. She also believed that Pamela had been provided all documents that showed Doris's income and all expenses listed on them. She did not understand what more Pamela was seeking beyond the actual credit card statements instead of a transaction list printed from the online transactions. Further, she agreed with Scott and Nancy's counsel that the FSA did not require that Scott provide his credit

card statements but required only that he provide trust credit card statements, of which there were none.

¶ 43 The trial court interjected, asking Pamela's counsel whether any of the case law he had cited in the motion for reconsideration applied general discovery principles to the circumstances of the present litigation, which was a closed case with a guardianship order already appointing guardians of the estate. Counsel responded that he had not cited any such cases.

¶ 44 The GAL resumed that Scott was entitled to pay Doris's expenses and reimburse himself, so long as he was not spending her money inappropriately. As indicated in her report, the bulk of the credit card statements reflected Scott's payment of legal fees. She had been asked to look at the documents to review whether there were inappropriate large sums of money taken from Doris's account, and she did not identify any. She had tried to answer Pamela's questions "over and over again" and "[didn't] know what else to do. They just [didn't] like the answers that have been given."

¶ 45 She continued that both sides had engaged in discovery and that it needed to end. She did not see how any of this continued litigation benefitted Doris. As a final remark, she noted that while she did not feel as if she had been bullied by anyone in this litigation, both sides had expressed their displeasure with her at various points walking out of court.

¶ 46 The trial court began its decision on Pamela's motion to reconsider denial of her motion to compel discovery by again remarking on the antipathy between the family members. It described Pamela as a "hostile and vexatious litigant." The trial court had appointed the GAL out of an abundance of caution, but Pamela was still unhappy with the discovery conducted and the GAL's report, and she wanted a forensic accountant and discovery depositions. Despite her requests, the trial court noted that no statutory provision nor any case provided that, after a guardian is

appointed, a litigant can year after year cause the estate the expense of having to defend every action. The trial court had discretion to limit discovery, and it was exercising that discretion.

¶ 47    Having disposed of Pamela's motion to reconsider, the trial court turned to Pamela's remaining objections and pending motions. It overruled Pamela's objections to the accounting, approved the pending accounting, and denied her petition to remove the guardians. It explained that it was untenable to allow "a disgruntled and unsuccessful party *** to raise objections to everything that's been filed in terms of accountings and annual reports and that the estate has to defend it." The trial court had appointed the GAL, and she reported that the accountings were in order and did not raise suspicions. The trial court continued that, while Pamela remained unhappy and wanted to continue to litigate, there had been no substantial change in circumstances to justify removal of the guardians, there had been no breach of the guardians' duties, and the objections to the accountings were groundless. That same day, the trial court entered a written order memorializing its rulings at the hearing and continuing Pamela's objection to the 2017-18 budget.

¶ 48    Pamela timely appealed the March 22, 2019, order.

¶ 49                    D.  Second Annual Accounting and Attorney Fees

¶ 50    In March 2019, Scott filed the estate's second accounting for October 2017 through September 2018, and about one month later, Scott and Nancy petitioned for attorney fees. Pamela objected to the second accounting on April 23, 2019, arguing that it failed to disclose estate assets, including Doris's Thrivent life insurance, that expenses did not match disbursements, and more.

¶ 51    That same day, Pamela also petitioned for reimbursement of attorney fees. She argued that the FSA provided for reimbursement of attorney fees incurred by a prevailing party who substantially received relief sought. She claimed that she had incurred fees in the amount of almost $47,000 in her efforts to enforce the terms of the FSA against Scott and Nancy.

¶ 52    The trial court heard Pamela's objection to the second accounting and the petitions for attorney fees on August 8, 2019. First, it overruled her objections to the budget and second accounting, explaining in part that "these things are not benefitting the estate in any fashion." It specifically found her objection to Nancy's fees for Doris's care to be speculative, explaining that even after Doris's placement in a care facility, Nancy had provided her some services. Turning to Pamela's petition for fees, the trial court conceded that she had raised some "minor issues" with potential benefit to the estate. For instance, it was right for her to point out the need to evaluate the amount of Nancy's continued fees to care for Doris after Doris was moved to a care facility, and to inquire as to the inclusion of Doris's life insurance in the annual accounting. However, the benefit to the estate was in very small proportion to the amount of fees sought, and the appropriate fees were hard to quantify. As best as the trial court could quantify, it concluded that $5000 of Pamela's requested fees were for actions beneficial to the estate. The balance of fees requested were for "continuing efforts to soil the name of *** the guardians and due to animosity between siblings," and did not benefit the estate. Thus, Pamela's petition for attorney fees was granted in part and denied in part.

¶ 53    As to Scott and Nancy's petition for fees, the trial court found that they were incurred mostly in response to various petitions as well as for normal duties. Their fees were reasonable and for Doris's benefit, and they were approved.

¶ 54    The trial court entered a written order the same day memorializing its oral rulings and approving the second accounting. It granted $22,168.47 in attorney fees and costs to Scott and Nancy's counsel from the estate.

¶ 55    Pamela timely appealed the trial court's August 8, 2019, order, and we consolidated the appeal with her appeal of the March 22, 2019, order.

¶ 56                                    II. ANALYSIS

¶ 57     Pamela identifies five arguments on appeal: (1) the trial court abused its discretion in terminating discovery; (2) the trial court's denial of her petition to remove Scott as guardian was against the manifest weight of the evidence; (3) the trial court abused its discretion in denying her motion to compel answers to discovery; (4) the trial court's overruling of her objections to the second annual accounting was against the manifest weight of the evidence; and (5) the trial court's grant of attorney fees was manifestly erroneous. We address her arguments in turn.

¶ 58     First, however, we must confirm our appellate jurisdiction. *In re Marriage of Salvatore*, 2019 IL App (2d) 180425, ¶ 15 (reviewing courts have an independent duty to examine their appellate jurisdiction). Pamela asserts that we have appellate jurisdiction over the March 22, 2019, order pursuant to Rule 303 (Ill. S. Ct. R. 303 (eff. July 1, 2017)), but that order was not a final judgment. See *Eclipse Manufacturing Co. v. U.S. Compliance Co.*, 381 Ill. App. 3d 127, 132 (2007) (a final judgment fixes absolutely and finally the rights of the parties; it determines the litigation on the merits so that, if affirmed, only the execution of the judgment remains). Instead, if we have jurisdiction, it derives from Rule 304(b)(1) (Ill. S. Ct. R.304 (b)(1) (eff. Mar. 8, 2016)). Rule 304(b)(1) provides for appeals from "[a] judgment or order entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." In establishing appellate jurisdiction, "only those orders which 'finally' determine a right or status of a party are subject to Rule 304(b)(1)." *In re Estate of Devey*, 239 Ill. App. 3d 630, 633 (1993).

¶ 59     Consistent with our case law, the denial of a petition to remove a guardian is immediately appealable under Rule 304(b)(1). See *In re Neuf's Estate*, 85 Ill. App. 3d 468, 469 (1980) (determining that "an order granting or denying removal of a conservator should be regarded as a final determination of a right or status within the meaning of Rule 304(b)(1)"); see also *In re Estate*

*of Ohlman*, 259 Ill. App. 3d 120, 124 (1994) (order appointing a guardian was not a final judgment but was appealable under Rule 304(b)(1)). The case law is consistent with the committee comments to Rule 304, which support that a ruling on motions to appoint or remove a guardian are final in character under Rule 304(b)(1). See Ill. S. Ct. R. 304, Committee Comments (rev. Sept. 1988) ("Subparagraph (1) applies to orders that are final in character although entered in comprehensive proceedings that include other matters. Examples are an order admitting or refusing to admit a will to probate, appointing or removing an executor, or allowing or disallowing a claim."). Accordingly, we have jurisdiction to review the denial of Pamela's petition to remove Scott as guardian.

¶ 60      As a general principle, the scope of review in an interlocutory appeal is normally limited to an examination of whether the trial court erred in granting or denying the interlocutory relief. *U.S. Bank National Ass'n v. In Retail Fund Algonquin Commons, LLC*, 2013 IL App (2d) 130213, ¶ 22. However, courts have recognized that review of an interlocutory order may well require review of "attendant" prior orders, that is, orders intertwined with the merits of an interlocutory order. *Id.* Here, the trial court's denial of further discovery was attendant to its denial of Pamela's petition to remove Scott as guardian. Her argument to remove Scott depended upon alleged accounting irregularities, and she had argued that additional discovery would help expose the alleged accounting irregularities.

¶ 61      On the issue of attorney fees, Pamela correctly asserts that we have jurisdiction under Rule 304(b)(1) because the trial court finally resolved her attorney fee petition in its August 8, 2019, order. See *In re Trusts of Strange ex re. Whitney*, 324 Ill. App. 3d 37, 42 (2001) (final resolution of a petition for attorney fees was immediately appealable under Rule 304(b)(1)). Although the trial court's overruling of her objection to the second accounting was not a final order, the objection

was part of her efforts to enforce the FSA at the time of her petition for attorney fees and was therefore attendant to the fee petition. Accordingly, we have jurisdiction to review all appealed orders.

¶ 62                                    A. Discovery

¶ 63    Pamela's first and third issues on appeal both involve discovery. That is, she argues separately that the trial court erred in denying her motion to compel answers to discovery and also in denying other further discovery. As these two issues substantially overlap, we address Pamela's arguments involving discovery together.

¶ 64    As to the denial of her motion to compel answers to discovery, she argues that the information she requested would have been admissible at trial or would have led to admissible evidence. She identifies the discovery sought as documents produced to the GAL, credit card records and bank statements pertaining to expenditures for Doris, documents evidencing renovation payments for Doris's residence prior to its sale, documents evidencing gifts from Doris to Scott or Nancy, and documents evidencing their legal fees charged to the estate. She continues that the trial court never ruled on whether the requested discovery was relevant.

¶ 65    As to the trial court's decision to limit further discovery, she argues that the trial court abused its discretion because, before terminating further discovery, it made no inquiry into whether the discovery she sought was relevant, subject to privilege, or burdensome to produce. She continues that both her objection to the accounting and her petition to remove the guardian were fact-based inquiries requiring discovery.

¶ 66    Pamela also disputes the trial court's reasoning that the discovery phase ended with the appointment of guardians, arguing that there is no distinction between a "pre-appointment and post-appointment guardianship case" for purposes of discovery. She takes exception to the GAL's

review and report, arguing that the GAL did not have an accounting background and did not perform an in-depth review of relevant financial documents.

¶ 67     Scott and Nancy respond that Pamela has not made a showing that the trial court's denial of her motion to compel discovery was arbitrary or unreasonable. They cite to the GAL's testimony that the motion should not be granted, and they argue that further discovery would not have benefited Doris.

¶ 68     We hold that the trial court did not abuse its discretion in denying Pamela's motion to compel answers to discovery or in staying further discovery. Trial courts are afforded wide latitude in determining the scope of discovery, and their rulings on discovery matters are generally reviewed for an abuse of discretion. *Pederson v. Mi-Jack Products, Inc.*, 389 Ill. App. 3d 33, 41 (2009). While the scope of permissible discovery is broad, it is not unlimited, and a trial court must exercise its discretion to balance the need for truth against the excessive burdens of discovery. *Y-Not Project, Ltd. v. Fox Waterway Agency*, 2016 Il App (2d) 150502, ¶ 43. An abuse of discretion occurs when no reasonable person would adopt the trial court's view. *Tirio v. Dalton*, 2019 IL App (2d) 181019, ¶ 65.

¶ 69     We first reject Pamela's characterization of the GAL as being unqualified and failing to conduct a thorough review. The record demonstrates that the GAL was a licensed attorney who prepared thorough reports based upon review of various relevant documentation, including credit card and bank statements, IRA account statements, and receipts for all manner of expenses. Given the trial court's consistent observation of antipathy between the sibling parties—even describing Pamela as a "hostile and vexatious litigant"—it was reasonable to rely on the conclusions and recommendations of the GAL, who was a neutral party appointed to look out for Doris's best interest.

¶ 70    Pamela also disputes the trial court's reasoning that discovery is not necessarily available in a "post-appointment" case. While we agree that there is no firm rule regarding the availability of discovery in post-appointment guardianship administration, we recognize that application of the discovery rules is meant to be "flexible and adaptable to the infinite variety of cases and circumstances appearing in the trial court." *Atwood v. Warner Electric Brake and Clutch Co., Inc.*, 239 Ill. App. 3d 81, 88 (1992). In a guardianship administration such as this, where the guardians were already appointed and significant discovery had already occurred, the trial court had to balance continuing discovery against the best interest of the ward. See Ill. S. Ct. R. 201(c)(3) (eff. July 1, 2014) (explaining that a trial court, in limiting or denying discovery, may weigh the burden or expense of discovery against its benefit and may also consider the importance of the issues and the importance of the discovery in resolving the issues).

¶ 71    Here, the trial court did just that in limiting further discovery. It determined that continued discovery would not benefit Doris, and it believed that the prior discovery along with the GAL's report were sufficient to resolve the issues at hand. This determination was reasonable given that the GAL, on the trial court's request, had provided a thorough review of the accounting, found the accounting to be in good order, and opined that further discovery would not benefit Doris. The GAL's opinion that further discovery would not benefit Doris was bolstered by the fact that continued litigation fees, including attorney fees, were being drawn from Doris's estate.

¶ 72    The GAL also testified that Pamela's counsel had been provided with sufficient documentation to show all of Doris's income and expenses, indicating that continued discovery requests were likely duplicative. See Ill. S. Ct. R. 201(a) (eff. July 1, 2014) ("Duplication of discovery methods to obtain the same information and discovery requests that are disproportionate in terms of burden or expense should be avoided."). For instance, she did not understand why

Pamela's counsel wanted credit card statements when the pertinent information had already been provided via online printouts.

¶ 73     In fact, Pamela's brief recites her request for "documents that had already previously been produced to the GAL for review," indicating that those documents had been reviewed for irregularities by the GAL in making her recommendations to the court. Likewise, Pamela's request for copies of checks would be largely duplicative with checking statements, which the GAL testified were provided to all counsel. As to gifts from Doris to Scott and Nancy, the GAL had reviewed all kinds of receipts and expenses, all the way down to receipts for groceries.

¶ 74     Thus, while Pamela's argument focuses on the relevance of her requested discovery, she overlooks the trial court's consideration of its relative burden. Given the trial court's reasonable determination that further discovery would not benefit Doris, as well as the duplicative nature of discovery sought, it did not abuse its discretion in denying Pamela's motion to compel discovery and limiting further discovery. As a final note, the trial court did not terminate all future discovery in this case, but it instead stayed discovery until further court order, leaving the door open to discovery on new issues as they may arise.

¶ 75                    B. Petition to Remove the Guardian of the Estate

¶ 76     Pamela next argues that the trial court's denial of her petition to remove Scott as guardian of the estate was against the manifest weight of the evidence. She argues that, under section 23-3 of the Probate Act of 1975 (Act) (755 ILCS 5/23-3 (West 2018)), the trial court erred in refusing to hold an evidentiary hearing on her petition for removal.

¶ 77     She further argues that under section 11a-10 of the Act, the GAL was only to advise the trial court on Doris's best interest and was not to become an "opinion witness at the accounting stage." She contends that the Act did not permit the trial court to abdicate its fact-finding role and

adopt the opinion of the GAL, that the GAL was not qualified to be an opinion witness, and that she performed an insufficient cursory review. She concludes that the trial court's denial was not supported by the evidence because it was supported only by the opinion of the GAL.

¶ 78    Scott and Nancy respond that Pamela failed to comply with statutory procedural requirements for a removal hearing, in that no rule to show cause or citation for removal ever issued or were served upon Scott. They further argue that there was substantial compliance with the spirit of the statute so that an evidentiary hearing was not required.

¶ 79    We hold that the trial court did not err in denying Pamela's petition to remove Scott as guardian. Pursuant to section 23-2 of the Act (755 ILCS 5/23-2 (West 2018)), an interested party may petition to remove a representative for a variety of reasons, including that the representative wasted or mismanaged the estate. There is no dispute that Pamela was an interested party, and Scott was a representative because he was guardian of Doris's estate (755 ILCS 5/1-2.15 (West 2018)).

¶ 80    Section 23-3 of the Act (755 ILCS 5/23-3 (West 2018)) provides for the procedure for removal of a representative. It requires that the trial court issue a citation to the representative to show cause why they should not be removed, and the representative is given an opportunity to file a pleading to the petition. *Id.* § 23-3(a), (c). "If on the hearing the court finds that [the representative] should be removed for any cause listed in Section 23-2, the court may remove him and revoke his letters." *Id.* § 23-3(c). Generally, if the representative denies the allegations in the citation, the court commences proceedings on the removal petition by conducting an evidentiary hearing. *In re Estate of Kirk*, 242 Ill. App. 3d 68, 73 (1993). At the hearing, the petitioner bears the burden of making a *prima facie* case for removal, and if they sustain their burden, the burden shifts to the representative to prove their fitness to retain office. *Id.* We will not reverse a decision

on a petition to remove a guardian unless it is against the manifest weight of the evidence. *In re S.F.*, 2020 IL App (2d) 190248, ¶ 37.

¶ 81    As to Scott and Nancy's response that proper procedure was not followed because no citation or notice issued pursuant to section 23-3, Illinois courts recognize that evidence of substantial compliance with section 23-3 is sufficient under the Act. *In re Estate of Tait*, 2017 IL App (3d) 150834, ¶ 19. Substantial compliance means that a party received a fair hearing and was not prejudiced by formal deficiencies in procedure. *Id.* ¶ 20. Here, even without a formal citation, Scott and Nancy were aware of Pamela's petition to remove Scott and her grounds for removal via her May 24, 2018, petition. Accordingly, the lack of a section 23-3 citation does not defeat Pamela's petition. See *In re Estate of Talty,* 376 Ill. App. 3d 1082, 1091-92 (2007) (excusing strict compliance with section 23-3 of the Act where the filing of the removal petition provided the executor notice).

¶ 82    On the other hand, we agree with Scott and Nancy that Pamela received a fair hearing on her removal petition, demonstrating substantial compliance with the Act.[1] The trial court heard

---

[1] It is unclear whether strict compliance with section 23-3 of the Act would necessarily require a full-fledged evidentiary hearing. Section 23-3 never specifically references or requires an *evidentiary* hearing. The limited case law on the matter suggests that the petitioner need only an opportunity to present "reasonable grounds" for removal. See *In re Lucas' Estate*, 71 Ill. 2d 277, 281-82 (1978) (agreeing with the appellate court's term "reasonable grounds" to support removal); see also *In re Estate of Talty*, 376 Ill. App. 3d at 1092 (holding that any procedural error was harmless when the executor had notice of removal and was given an opportunity to be heard on the issue).

arguments from both parties and heard the GAL respond. The hearing took place March 22, 2019, approximately 10 months after Pamela petitioned for Scott's removal. The parties had been engaged in discovery before and after the removal petition was filed, and the GAL provided her supplemental report to all parties over a month before the hearing. To the extent Pamela argues that she did not have access to additional discovery, we have already determined that the trial court's denial of that discovery was not an abuse of discretion. After hearing the parties' arguments, the trial court concluded that the guardians had not breached their duties and that the objections to the accounting were groundless. It therefore denied Pamela's petition to remove Scott as guardian. Under these circumstances, the hearing substantially complied with section 23-3 of the Act.

¶ 83    Turning to Pamela's argument that the GAL's review was insufficient and that her role did not comply with section 11a-10 of the Act, we find her argument unpersuasive. First, section 11a-10 is not on point because it does not provide the procedure for a hearing to remove a representative but instead provides for the procedure preliminary to a hearing on the adjudication of disability and initial appointments of a guardian. *Compare* 755 ILCS 5/11a-10 (West 2018) (procedure preliminary to a hearing on a petition filed pursuant to section 11a-8), *with* 7555 ILCS 5/23-3 (West 2018) (procedure for removal of a representative).

¶ 84    More importantly, the trial court had every right to rely on the GAL's report and recommendation, which it had asked her to make. See *In re Mark W.*, 228 Ill. 2d 365, 374 (2008) ("A guardian *ad litem* functions as the 'eyes and ears of the court' and not as the ward's attorney."). The GAL's review was anything but insufficient: as we have previously discussed (see *supra* ¶ 69), she reviewed all manner of financial disclosures and made thorough reports based on her review. The GAL did not find evidence that Scott was hiding assets or that assets were unaccounted

for, and she found that he substantially complied with the FSA. She had met with Pamela and her counsel to try to discern all their specific concerns, and she believed that she could reconcile all their alleged accounting discrepancies.

¶ 85    Thus, the record rebuffs Pamela's characterization of the GAL in this case as an "opinion witness at the accounting stage." Rather, the characterization is consistent with the GAL's observation that "[t]hey just don't like the answers that have been given." The GAL here simply did her job: she reviewed the financial disclosures, reconciled alleged discrepancies, and reported to the court. The GAL's conclusions supported the trial court's determination that Scott had not breached his duties as guardian of the estate, and therefore the denial of Pamela's petition to remove him as guardian was not against the manifest weight of the evidence.

¶ 86                    C. Objection to the Second Annual Accounting

¶ 87    Pamela also argues that the trial court erred in overruling her objection to the second accounting. She argues that she raised several objections as follows: (1) the accounting's failure to disclose the ward's life insurance policy; (2) a discrepancy in income compared to the ward's tax returns; (3) a discrepancy between the expenses reported in the accounting and other disbursements; (4) discrepancies in the stated value of the ward's investment accounts; (5) expenses indicated as payments to a caregiver, which were paid to the guardian's personal account; (6) payments to a guardian's personal credit card that were not supported by an actual credit card statement; and (7) payments to the guardian of the person for care of the ward after the ward was no longer living with her. She argues that the trial court failed to make findings on each objection individually and instead relied solely on the GAL's opinion, inappropriately abdicating its fact-finding function.

¶ 88     We reject Pamela's argument that the trial court erred in overruling her objection to the second accounting. Pamela correctly states in her brief that we "must reverse *** if 'an examination of the record as a whole indicates that the decision was against the manifest weight of the evidence.' " *In re Estate of Berger*, 166 Ill. App. 3d 1045, 1057 (1987); see also *Altieri v. Estate of Snyder*, 262 Ill. App. 3d 427, 434 (1992) (supporting the standard of review on an objection to accounting). Here, however, the record does not indicate that the trial court's overruling was against the manifest weight of the evidence. Scott and Nancy filed responses to the objections, and Pamela filed a reply to their responses. The trial court held a hearing in which both sides advanced their arguments on the objections, and the GAL was present to respond. The GAL once again went through a recitation of Doris's accounts with the court and concluded that there was nothing untoward in the accountings. She had tried to follow the logic of Pamela's accounting but could not, since Pamela often was listing the incorrect amounts for accounts.

¶ 89     We share the GAL's frustration in understanding and parsing Pamela's objections. In her brief, Pamela never spells out the alleged errors or discrepancies in detail, numerically or otherwise. Instead, her assertions lack specificity: she argues that some supporting documents were inauthentic, that the second accounting recognized "some unrealized gains in two of the investment accounts" that were incongruous with some other tax returns, and that Nancy continued to receive some payments for care after Doris no longer lived with her. As to whether certain payments to Nancy were justified, the trial court found any discrepant amount speculative. This finding was reasonable because Pamela did not provide evidence that Nancy did not continue to provide some care, much less for which months. Furthermore, Pamela even concedes that some of her alleged discrepancies may be due to improperly correlated time periods, which is something the GAL had

previously addressed in her reports. Simply put, alleging something is error does not alone make it error.

¶ 90    Moreover, the trial court mentioned that a procedure had been set forth for objecting to accountings, requiring either agreement of the parties or a court order. It does not appear that Pamela's objections proceeded by either method. Regardless, the trial court's conclusion that the objections were not benefitting Doris was reasonable. It remarked that Doris's "financial well being is there. This is a fight between siblings, and this Court has heard it." Pamela provides us no reason to say otherwise.

¶ 91                                    D. Attorney Fees

¶ 92    Lastly, Pamela argues that the trial court erred in granting only $5000 in attorney fees to her counsel. She argues that the trial court's determination on her fee petition was vague and unsupported by reviewable factfinding. Instead, the trial court conducted "an estimate" of its view of the case.

¶ 93    Likewise, she argues that the trial court failed to do a full inquiry with proper factfinding in awarding opposing counsel $60,000 in fees, including failure to discuss the reasonableness of the fees requested. She argues that this court should reverse the trial court's August 8, 2019, order, which granted her only $5000 in fees while granting the guardian's petition in full, and remand for a full evidentiary inquiry on both attorney fee petitions.

¶ 94    We reject Pamela's arguments over attorney fees. Under the terms of the FSA, a prevailing party is entitled to recover costs and expenses, including reasonable attorney fees, from the non-prevailing parties in connection with litigation related to the FSA. The FSA defines a prevailing party as a party who "receives substantially the relief desired, whether by settlement, dismissal, summary judgment, judgment or otherwise." The parties under the FSA were Doris, Scott, Nancy,

Pamela, Bruce, and Wells Fargo. While we will not overturn a trial court's award of attorney fees for a representative unless they are manifestly or palpably erroneous (*In re Estate of Coleman*, 262 Ill. App. 3d 297, 299 (1994)), Pamela was not a representative. Therefore, we apply the typical abuse-of-discretion standard to her fee petition. See *City of McHenry v. Suvada*, 2011 IL App (2d) 100534, ¶ 17.

¶ 95    Here, it is difficult to say whether Pamela substantially prevailed on any of her motions or petitions. In our disposition we have already determined that the trial court did not err in denying her motion to compel discovery, denying her motion to remove Scott as guardian, and overruling her objection to the second accounting. In its partial award of fees, the trial court cited to only some minor objections of benefit to the estate, including whether Nancy's fees for continued care of Doris were justified and whether Doris's life insurance was listed in the accounting. We note that Pamela's challenge to Nancy's fees for care and her request to disclose Doris's life insurance were but two of her many objections to the accountings. Furthermore, we have already discussed that the alleged discrepancies in Nancy's fees were speculative, and as to Doris's life insurance, Scott had disclosed it on the first accounting, and he readily disclosed it again in response to the objection to the second accounting.

¶ 96    Under these facts, we cannot say that the trial court's decision to award Pamela $5000 in fees was an abuse of discretion. We agree with the trial court that it was difficult to quantify the value of fees connected with successful actions, and if anything, its award of $5000 for Pamela was magnanimous.

¶ 97    Furthermore, the record does not support that the trial court awarded $60,000 in fees to opposing counsel, as Pamela contends. Rather, the August 8, 2019, order awarded $22,168.47 in attorney fees and costs to Scott and Nancy's firm for the period of October 1, 2018, through April

5, 2019. It found those fees necessary and reasonable. As noted in the fee petition, Scott and Nancy's counsel stated that fees were higher than in a typical guardianship due to the contested issues and complications arising therefrom, including a thorough review of the first accounting; frequent contact with clients, opposing counsel, and the GAL; and numerous court appearances. The record supports these assertions. For instance, there were at least two lengthy hearings during the relevant period, one on Pamela's motion to compel discovery and another on her motion to reconsider, at which Scott and Nancy substantially prevailed. Accordingly, Pamela has failed to demonstrate that the actual award of $22,168.47 was manifestly erroneous.

¶ 98                                III. CONCLUSION

¶ 99    For the foregoing reasons, we affirm the March 22, 2019, and August 8, 2019, orders of the Du Page County circuit court.

¶ 100   Affirmed.