2025 IL App (1st) 232257

SECOND DIVISION
November 12, 2025

No. 1-23-2257

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| ROSS WOLFSON and MATT MAHAY, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 17 CH 3384 |
| | ) | |
| DUGOUT NORTHBROOK, LLC; GK HOLSTE, LLC; | ) | |
| KENT KNEBELKAMP; and PLAY BALL USA- | ) | |
| NORTHBROOK/GLENVIEW, LLC, | ) | Honorable |
| | ) | Thaddeus Wilson, |
| Defendants-Appellants. | ) | Judge Presiding. |

---

PRESIDING JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Justices Ellis and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2014, Ross Wolfson, Matt Mahay, and Kent Knebelkamp formed Play Ball USA-Northbrook/Glenview, LLC (Play Ball), which provided little league and baseball-related services. Wolfson and Mahay (collectively "plaintiffs") together owned 50% of Play Ball while Knebelkamp owned the other 50%. At the beginning, the three owners co-managed the company. However, disagreements on how to run the company arose, and ultimately, plaintiffs sued

Knebelkamp to involuntarily dissolve Play Ball and divide its assets according to respective percentage ownership. Plaintiffs eventually moved for summary judgment, and the circuit court granted their motion on the involuntary dissolution claim, among others. The court also awarded plaintiffs compensatory and punitive damages. Knebelkamp appeals the court's summary judgment order as well as its decisions to award compensatory and punitive damages.[1] For the following reasons, we affirm.

¶ 2                                I. BACKGROUND

¶ 3                                A. The Complaint

¶ 4     On August 26, 2021, plaintiffs filed their fifth amended complaint, which is the operative complaint in this appeal. They alleged as follows.

¶ 5     Plaintiffs and Knebelkamp formed Play Ball in November 2014. Play Ball provided little league and baseball-related services to the community. Plaintiffs and Knebelkamp co-managed Play Ball at the beginning. Plaintiffs collectively owned 50%[2] of the company, and Knebelkamp owned the other 50%. In forming Play Ball, Wolfson invested $20,000.

¶ 6     Play Ball leased a facility located on a property owned by defendant GK Holste, LLC (Holste), which Knebelkamp partly owned and managed. Holste agreed to pay all utilities and provide approximately 6,400 square feet (about 25% of the entire property) in exchange for $4,000 per month in rent.

¶ 7     In 2016, disputes arose between plaintiffs and Knebelkamp regarding the management of Play Ball. That same year, Knebelkamp took control over Play Ball's accounting and finances.

---

[1]In this decision, we use "Knebelkamp" to refer to Knebelkamp himself as well as his companies Dugout Northbrook, LLC, and GK Holste, LLC.

[2]It is not clear from the pleadings exactly what percentage Wolfson and Mahay each owned, but it appears Wolfson's share of Play Ball was close to 50%.

Due to the disputes, the three owners agreed to divide Play Ball's assets and alter its management structure. That is, plaintiffs would terminate their positions as managers upon division of Play Ball's assets, and Knebelkamp would continue to run Play Ball, albeit under a different name. Plaintiffs would retain rights to "Play Ball," and Knebelkamp would refrain from using that name. In late 2016, the three agreed that Play Ball would operate as "The Dugout" after the division of assets. In other words, all three would continue to own The Dugout, but only Knebelkamp would have managerial rights. Based on Knebelkamp's agreement with plaintiffs as to the division of assets, plaintiffs ceased managing the day-to-day operations of the business in November 2016.

¶ 8      However, Knebelkamp, after taking full control of the business, refused to divide the company's assets as previously agreed. He instead attempted to reduce Wolfson's ownership interest in the company from nearly 50% to 25%, stating this would be the only way that he and Wolfson would continue as business partners. Wolfson refused the reduction.

¶ 9      At the time the initial disputes arose, Play Ball possessed the following assets: customers, including both individuals and teams; computers; a HitTrax machine; catch nets; softball and hardball pitching machines and mats; bats, balls, and helmets; plyo equipment; stretch bands; L-screens; office and waiting room furniture; cameras, radar guns, and TVs; and softball and hardball padding. Although Wolfson invested $20,000 in Play Ball's formation, nearly all of Play Ball's equipment was paid for through ongoing business revenue.

¶ 10     Plaintiffs continued to attempt to find a resolution, but Knebelkamp refused to act in good faith and participate in efforts to reach an agreement. On February 24, 2017, plaintiffs served Knebelkamp a demand for the formal dissolution of Play Ball via U.S. mail, electronic mail, and certified mail. Knebelkamp ignored the demand and continued to operate the business himself.

¶ 11 In March 2017, Knebelkamp formed Dugout Northbrook, LLC (Dugout), which operated until its dissolution in September 2018. Dugout's business was identical to Play Ball's and was managed solely by Knebelkamp. Upon plaintiffs' information and belief, Knebelkamp transferred all of Play Ball's assets to Dugout. This was all done to exclude plaintiffs from any control over Play Ball's assets.

¶ 12 Also in March 2017, Knebelkamp utilized his holding company, Holste, to lease the newly founded Dugout entity the entire property that Play Ball had partially leased. That is, he leased the entire 22,400 square foot property to Dugout (as opposed to the 6,400 square foot portion that Play Ball previously rented). Upon plaintiffs' information and belief, there is no way Knebelkamp could have used the entire property for Dugout's operations. Rather, he rented unused portions of the property to other businesses. In exchange for renting himself his entire property through his holding company, he collected $15,000 a month in rent from Dugout (while Play Ball's rent was previously only $4,000). Also, Knebelkamp agreed on behalf of Dugout to pay Holste's monthly utilities for the entire property in the amount of $15,000 (while Play Ball did not pay any utilities as the utilities were covered by the $4,000 rent payment). In short, Knebelkamp agreed to pay Holste — that is, himself — $30,000 a month to operate Dugout. That is, he operated a business essentially identical to Play Ball, but for $26,000 more per month, and all the money was funneled into his own holding company.

¶ 13 On September 16, 2018, Play Ball, through Knebelkamp, filed its 2017 partnership tax return. The return indicated the company had a base income of $101,531. The return also indicated that Wolfson, as a member of Play Ball, had a distributable base income of $50,022. Play Ball, which was under the sole control of Knebelkamp, did not distribute Wolfson his portion of the base income.

¶ 14    Pursuant to the above-mentioned allegations in the fifth amended complaint, plaintiffs alleged seven counts.[3] Knebelkamp does not challenge the rulings on counts VII and VIII, which were decided in his favor. Additionally, there is no indication in his brief on appeal that he seeks to challenge the court's rulings on counts I and VI. That leaves counts II, III, and IV for our review.

¶ 15    Count II, conversion, alleged that Knebelkamp has wrongfully taken sole possession and control over various property to which plaintiffs have an absolute and unconditional right to immediate possession. Examples of such behavior include Knebelkamp's retention and/or misappropriation of the above-listed Play Ball assets, as well as Wolfson's initial $20,000 investment.

¶ 16    Count III alleged that Knebelkamp breached his fiduciary duty to plaintiffs, including but not limited to, the following ways: he fraudulently induced the withdrawal of plaintiffs from the day to day operations of Play Ball; he wrongfully and knowingly refused to honor the terms of his agreement concerning the assets and management of Play Ball; he wrongfully threatened to exclude plaintiffs entirely from the assets or and their ownership interests in Play Ball; and he conducted a campaign of unauthorized *ultra vires* actions that eradicated any business purpose of Play Ball.[4]

¶ 17    Count IV alleged unjust enrichment. Essentially, count IV claims that Knebelkamp and Holste have been unjustly enriched through the lease and utilities scheme Knebelkamp set up between Dugout and Holste. See *supra* ¶ 12.

¶ 18                      B. Motion for Summary Judgment

---

[3]Originally, there were eight counts, but count V was dismissed and is irrelevant for purposes of this appeal.

[4] *Ultra vires* acts are "beyond the scope of power allowed or granted by a corporate charter or by law." *Ultra Vires*, Black's Law Dictionary (12th ed. 2024).

¶ 19                    1. Plaintiffs' Motion for Summary Judgment

¶ 20    On May 3, 2022, plaintiffs filed their motion for summary judgment. We will address counts II, III, and IV as they are the only ones relevant to this appeal.

¶ 21    As to count II (conversion), plaintiffs argued that Knebelkamp continues to exercise control over plaintiffs' 50% share of Play Ball's assets. Knebelkamp has used Play Ball's assets to pay his own personal expenses, thereby diluting the assets. Despite multiple demands for distribution, Knebelkamp has continued to retain possession of Play Ball's assets.

¶ 22    As to count III (breach of fiduciary duty), plaintiffs argued that as one of Play Ball's managers, Knebelkamp owed a fiduciary duty to both Play Ball and to plaintiffs. Rather than acting in conformity with said duties, Knebelkamp formed an entity (Dugout) to compete with Play Ball, hired Play Ball's employees into that new entity, converted Play Ball's equipment and other assets, usurped Play Ball's business opportunity, and stole money from Play Ball's bank accounts to use for the new entity.

¶ 23    As to count IV (unjust enrichment), plaintiffs argued that Knebelkamp has unjustly retained, to his benefit and to plaintiffs' detriment, Play Ball's assets, including the rented space, baseball equipment, and employees. The retention of those assets violates the principles of justice, equity, and good conscience because plaintiffs, as members of Play Ball, are entitled to a prorated share of Play Ball's assets upon dissolution.

¶ 24    Plaintiffs filed a statement of facts with their motion for summary judgment, which was consistent with the fifth amended complaint. They attached 23 exhibits to the statement, including Wolfson's affidavit, Play Ball's lease with Holste, Knebelkamp's deposition, e-mail communications among plaintiffs and Knebelkamp, a draft withdrawal agreement, Wolfson's deposition, Dugout's bank records, the demand letter plaintiffs sent to Knebelkamp, utility bills,

Play Ball's tax records, and a business valuation of Dugout by Erin Hollis, plaintiffs' expert. We will discuss that statement and its exhibits to the extent they become relevant to this decision.

¶ 25                                2. Knebelkamp's Response

¶ 26    On May 23, 2022, Knebelkamp filed his opposition to the plaintiffs' motion for summary judgment.

¶ 27    As to count II (conversion), Knebelkamp argued that there was a question of fact as to whether plaintiffs had proven the elements of conversion. He argued that there were questions of fact as to whether (1) there was any property belonging to Play Ball, and (2) plaintiffs are entitled to such property, if any.

¶ 28    As to count III (breach of fiduciary duty), Knebelkamp argued that there was a question of fact as to whether plaintiffs have proven the elements of a breach of fiduciary duty. He argued that plaintiffs did not provide a single citation to the factual record in support of this claim.

¶ 29    As to count IV (unjust enrichment), Knebelkamp argued that, as with dissolution, plaintiffs did not allege the absence of a legal remedy as a condition precedent to allowing equitable relief. He also argued that plaintiffs did not provide a single citation to the factual record in support of this claim. Instead, according to Knebelkamp, plaintiffs relied "on the same faulty presumption that defendants usurped funds and assets from Play Ball and converted them over to defendant Dugout."

¶ 30    Knebelkamp's response included only one exhibit — his motion to dismiss. Knebelkamp also filed a response to plaintiffs' statement of facts, which essentially mirrored in form an answer to a complaint. That is, he admitted or denied portions of plaintiffs' statement of facts but did not cite anything in support. He also did not attach any exhibits. We address that response to the extent it is relevant to this decision.

¶ 31                               3. The Court's Decision on Summary Judgment

¶ 32    On December 21, 2022, the circuit court issued a written decision on the summary judgment motions, granting plaintiffs' motions as to counts I through IV and VI, denying plaintiffs' motions as to counts VII and VIII, granting Knebelkamp's motion as to counts VII and VIII, and denying Knebelkamp's motion as to count VI. As Knebelkamp challenges only the court's rulings on counts II, III, and IV, we summarize the court's decisions on only those counts.

¶ 33    As to count II (conversion), the court noted that plaintiffs submitted copies of Dugout's bank records along with a copy of Knebelkamp's deposition transcript. The bank accounts showed numerous transfers of money from Play Ball's bank account to Dugout's bank account. During his deposition, Knebelkamp testified that he transferred money from Play Ball's bank account into Dugout's for three months. Knebelkamp also testified that Dugout retained one computer previously used by Play Ball and that Dugout had access to Play Ball's customer lists. The court found that Knebelkamp did not offer any evidence to refute plaintiffs' allegations. The court also found that, on the basis of this undisputed evidence, plaintiffs showed that Play Ball had existing assets, at the very least in the form of money, a computer, and customer lists. The court found that because Play Ball owned these assets, plaintiffs had shown that they had the right, as members of Play Ball, to immediately possess the assets. Plaintiffs had also shown that they made a demand for possession and that Knebelkamp wrongfully and impermissibly assumed control over Play Ball's assets. Despite plaintiffs' repeated demands to divide Play Ball's assets, Knebelkamp repeatedly refused to divide them. Ultimately, the court found that regardless of whether Play Ball's bank account once contained $0 or whether certain baseball equipment was given to Wolfson, there was no genuine issue of material fact that Knebelkamp converted plaintiffs' assets.

¶ 34     As to count III (breach of fiduciary duty), the court stated it was unaware of any Illinois authority that directly informs whether the fiduciary duty a member owes to an LLC survives past dissolution. However, it noted that Illinois courts have found that the fiduciary duty of owners of other business types does extend through dissolution and wind up. Citing Illinois and California case law, it found that Knebelkamp's fiduciary duty to Play Ball extended beyond when it ceased operating in March 2017 and through its wind up, which had not yet occurred. The court further supported this finding by noting that section 15-3 of the Limited Liability Company Act (805 ILCS 180/15-3 (West 2022)) imposes a duty of loyalty during the wind up itself.

¶ 35     Further, the court found that Knebelkamp's breach of fiduciary duty to Play Ball resulted in its assets benefiting Knebelkamp rather than Play Ball. The court also found that Knebelkamp's misconduct caused plaintiffs harm in that it was "reasonably foreseeable that their membership rights would be violated and that Play Ball would lose the benefit of its assets to be dispersed, following Mr. Knebelkamp's cooptation of said assets." The court found that Knebelkamp did not contest these findings. Accordingly, the court ruled in plaintiffs' favor on count III.

¶ 36     As to count IV (unjust enrichment), the court stated that to prevail on an unjust enrichment claim, a plaintiff must prove "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." Having already found that Knebelkamp wrongfully retained Play Ball's assets to plaintiffs' detriment, the court further found that such wrongful conduct also violated the fundamental principles of justice, equity, and good conscience.

¶ 37               C. Plaintiffs' Motion for Compensatory Damages

¶ 38     On January 23, 2023, plaintiffs filed their motion for compensatory damages. Plaintiffs argued that, based on the circuit court's December 21, 2022, order, they were owed $513,010.31

in compensatory damages. They asserted that the circuit court found that Knebelkamp "wholly owned" Dugout, that Dugout was the successor to Play Ball, and that Knebelkamp "wrongfully and impermissibly" converted Play Ball's assets for the use and benefit of himself, in breach of his fiduciary duties. Plaintiffs argued that, as 50% owners of Play Ball, they were entitled to disgorgement of 50% of all payments that Knebelkamp made for Dugout's expenses using Play Ball's assets from March 2017 to September 2020. That amount was composed of (1) the difference between Play Ball and Dugout's monthly rent from April 2017 to September 2020, half of which totaled $195,869.22; (2) the utility payments Dugout made for heating, electricity, and security services, half of which totaled $42,891.09; (3) the cash distributions Dugout issued to Knebelkamp from April 2017 to September 2020, half of which totaled $53,750; and (4) the fair market value of Dugout as of September 30, 2020, half of which totaled $220,500.

¶ 39    As to the rental fees, plaintiffs alleged that Play Ball's original lease with Holste required Play Ball to pay $4,000 per month in rent, but Knebelkamp entered into a new lease with Holste, which required Dugout to pay $15,000 per month for rent, and paid it using Play Ball's converted assets. For the utility payments, plaintiffs alleged that Play Ball did not have to pay for any utilities under its original lease, but Dugout's new lease required it to pay for heating, electricity, and security services. Plaintiffs further alleged that Knebelkamp paid himself $107,500 in cash from Dugout's accounts. Plaintiffs supported the motion with an affidavit from their attorney, Jeffery M. Heftman. Heftman averred that the amounts stated above were based on his review of Dugout's monthly balance sheets showing its distributions from March 1, 2017, to September 30, 2020, which Knebelkamp had produced at discovery. Heftman also provided summaries of those balance sheets, listing who Dugout paid, the amount paid, and the date of payment. Balance sheets were also attached to plaintiffs' motion. Finally, plaintiffs argued that their expert, Erin Hollis, who

holds a master's degree in accounting, provided an unrebutted report reflecting that, on September 30, 2020, Dugout had a fair market value of $441,000.

¶ 40    In response, Knebelkamp argued that plaintiffs were not entitled to any compensatory damages because (1) plaintiffs were dissociated members under the Limited Liability Company Act, and (2) Hollis incorrectly calculated Dugout's value under the Business Corporation Act of 1983 (Business Corporation Act) ((805 ILCS 5/1.01 *et seq.* (West 2016)), instead of the Limited Liability Company Act. Knebelkamp first contended that under the 2016 version of section 35-60(a)(1) of the Limited Liability Company Act, a "former member's distributional interest [is] 'determined as of the date of the member's dissociation.' " See 805 ILCS 180/35-60(a)(1) (West 2016) (repealed by Pub. Act 99-637, § 10 (eff. July 1, 2017)).

¶ 41    Knebelkamp further argued that plaintiffs had voluntarily "withdr[awn] from any actual control and involvement in Play ball" around November 2016 and Play Ball was dissolved "no later than March 8, 2017." Knebelkamp asserted that after plaintiffs had dissociated from the company, they were no longer members of the company under the Limited Liability Company Act and were "treated as a transferee of a member." As such, any evidence of Dugout's expenses between March 2017 and September 2020 was irrelevant to the current case. Rather, Knebelkamp asserted, Play Ball had $75,000 in assets when plaintiffs dissociated from the company, so at most, they were owed only $37,500. Knebelkamp further argued that plaintiffs, as dissociated members, could not challenge the company's expenditures and could not recover for rent or other utility payments.

¶ 42    Knebelkamp then argued that plaintiffs' expert, Hollis, incorrectly calculated Dugout's value under the Business Corporation Act (805 ILCS 5/1.01 *et seq.* (West 2016)), instead of the Limited Liability Company Act, because (1) under the Limited Liability Company Act, there

should be "no distributions at all" as Dugout's liabilities exceeded its assets, (2) the Business Corporation Act does not apply to LLCs undergoing dissolution, and (3) Hollis made incorrect assumptions that required cross-examination at trial.

¶ 43     Plaintiffs replied that Knebelkamp's arguments (1) were improper collateral attacks on the circuit court's December 21, 2022, order, (2) misrepresented the record because plaintiffs had withdrawn from Play Ball as managers, not as members, (3) were unavailing because Hollis's expert report is unrebutted, and (4) failed to dispute the amount of damages caused by Knebelkamp's breach of his fiduciary duties.

¶ 44     On June 1, 2023, the circuit court granted plaintiffs' motion for compensatory damages and awarded them $513,010.31. Citing *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1071 (2001), the court held that "willful and deliberate breaches of fiduciary duty require complete forfeiture of all compensation during the span of the breach." The court noted that it had previously found that Knebelkamp breached his fiduciary duty to Play Ball by (1) "forming Dugout, which either succeeds or competes with Play Ball," and (2) "engaging in conduct that resulted in Play Ball's assets being held to the benefit of Mr. Knebelkamp, Dugout, and Holste, rather than to Play Ball's own benefit." The court found that Dugout was the successor to Play Ball, that Dugout paid $11,000 in rent to Play Ball, and that Play Ball's lease did not require it to pay for utilities. However, Dugout's lease required payment of "all prior and future utility costs for the leased property." The circuit court also found, based on Heftman's affidavit, that (1) from March 1, 2017, to September 30, 2020, Dugout paid Knebelkamp $107,500; (2) between April 2017 and September 2020, Dugout paid $571,738.45 in rent, while Play Ball paid $180,000 in rent; and (3) Dugout paid $25,987.58 for heating, $51,390.72 for electricity, and $8,403.89 for security

services. The court also found that Hollis's report was unrebutted, as Knebelkamp failed to offer any opposing expert evidence.

¶ 45                    D. Plaintiffs' Petition for Attorney Fees

¶ 46    On January 23, 2023, plaintiffs also filed their petition for attorney fees as punitive damages. They requested $374,239.33 in attorney fees for Knebelkamp's breach of his fiduciary duties. Plaintiffs argued, in relevant part, that they were entitled to punitive damages because the circuit court had found that Knebelkamp acted with reckless indifference to plaintiffs' rights and breached his fiduciary duties to them. Plaintiffs then provided an explanation of the nature of the case, the parties involved, the attorneys working on the matter, the attorneys' experience and standing, the amount of time expended, and the hourly rate charged. They also explained the importance of the case, the benefit of their representation to plaintiffs, the usual charge for comparable services, and the connection between the fees charged and amount involved in the litigation.

¶ 47    Knebelkamp argued in response that (1) the circuit court previously denied plaintiffs' fee petition on April 11, 2022, (2) the fees requested were excessive, (3) there was no legal basis to award plaintiffs attorney fees, and (4) certain invoice entries must be stricken as unrelated to this case or unreasonable.

¶ 48    Plaintiffs replied that (1) the circuit court's April 11, 2022, order did not bar plaintiffs from seeking attorney fees going forward, (2) the fees requested were reasonable for the work provided and the time spent, and (3) the court could award attorney fees as punitive damages for Knebelkamp's breaches of his fiduciary duties.

¶ 49    Also on June 1, 2023, the circuit court issued its decision on plaintiffs' petition for attorney fees as punitive damages, awarding them $187,119.67. This award represented 50% of plaintiffs'

requested attorney fees. The court found that punitive damages are available for breach of fiduciary duty (citing *Tully v. McLean*, 409 Ill. App. 3d 659 (2011)) and that attorney fees may be imposed as punitive damages (citing *In re Estate of Talty*, 376 Ill. App. 3d 1082, 1093 (2007)). It further found, for the reasons stated its the December 21, 2022, order, that (1) Knebelkamp breached his fiduciary duty to Play Ball, (2) Knebelkamp's breach was "willful, outrageous and aggravating" as well as "egregious, extreme, reckless, intentional, and calculated to and indeed caused harm to Plaintiffs," (3) Knebelkamp benefitted substantially from his breach, (4) attorney fees were reasonable and necessary as punitive damages, and (5) Knebelkamp was able to pay the punitive damages award.

¶ 50    Knebelkamp appeals.

¶ 51                                        II. ANALYSIS

¶ 52    On appeal, Knebelkamp argues that the circuit court erred in entering summary judgment in plaintiffs' favor. He also argues that the court erroneously awarded plaintiffs compensatory and punitive damages.

¶ 53                                   A. Summary Judgment

¶ 54    On appeal, Knebelkamp specifically challenges the court's grant of summary judgment in favor of plaintiffs on counts II, III, and IV.

¶ 55    Plaintiffs moved for summary judgment under section 2-1005 of the Code of Civil Procedure. 735 ILCS 5/2-1005 (West 2022). Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* § 2-1005(c). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the

movant and liberally in favor of the opponent." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Id.* We review a circuit court's summary judgment decision *de novo*. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007).

¶ 56                                1. Count II: Conversion

¶ 57    Knebelkamp argues that three disputed questions of fact exist about whether conversion occurred: (1) whether there was anything to convert, (2) whether plaintiffs could have received a distribution of assets even if a wind up[5] had occurred in 2016 (when plaintiffs requested distribution), and (3) whether the real estate lease between Play Ball and Holste prevented the distribution of Play Ball's assets.

¶ 58    Conversion is the wrongful deprivation of property from the person entitled to its possession. *In re Karavidas*, 2013 IL 115767, ¶ 60. To prove conversion, plaintiffs must establish that (1) they have a right to the property, (2) they have an absolute and unconditional right to the immediate possession of the property, (3) they made a demand for possession, and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Id.* ¶ 61. Knebelkamp does not explain how his three alleged factual disputes relate to the elements of a conversion claim. However, it appears that the factual disputes he alleges are germane to the second element of conversion (that plaintiffs have an absolute and unconditional right to the immediate possession of the property). Therefore, we will review them.

¶ 59    We address Knebelkamp's first and second allegations regarding disputes of fact together, as they share a common flaw: they are both unsupported by affidavits or other evidence.

---

[5]Winding up refers to the finalization of all business affairs before the company ceases to exist legally. See 805 ILCS 180/35-4 (West 2022).

¶ 60    In opposing summary judgment, the "nonmoving party must present a factual basis that would arguably entitle the party to a judgment." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). "The mere suggestion that a genuine issue of material fact exists without supporting documentation does not create an issue of material fact precluding summary judgment." *In re Marriage of Palacios*, 275 Ill. App. 3d 561, 568 (1995). In the face of supporting affidavits from the moving party, the nonmovant must submit counteraffidavits (or refer to depositions or admissions on file) in order to raise an issue of fact sufficient to survive summary judgment. *Werckenthein v. Bucher Petrochemical Co.*, 248 Ill. App. 3d 282, 288 (1993). Failure to file counteraffidavits in opposition to a summary judgment motion supported by affidavits is fatal. *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 391 (1994).

¶ 61    In his deposition, Knebelkamp testified that Play Ball had a negative net worth in 2016, and now argues that because of that negative net worth, there was nothing to convert. However, the valuation year for Play Ball was 2020, not 2016, as we explain in paragraphs below (*infra* ¶¶ 87-90). Accordingly, Knebelkamp did not create a dispute of material fact.

¶ 62    Knebelkamp also argues that neither plaintiff could receive a distribution because Play Ball had an unpaid creditor. In support of this contention, he cites section 35-10(a) of the Limited Liability Company Act:

> "In winding up a limited liability company's business, the assets of the company   must
> be applied to discharge its obligations to creditors, including members who are creditors.
> Any surplus must be applied to pay in money the net amount distributable to members in
> accordance with their right to distributions under subsection (b) of this       Section."   805
> ILCS 180/35-10(a) (West 2022).

16

¶ 63    According to this section of the Limited Liability Company Act, a company that is winding up must distribute its assets to creditors first, which includes members who are creditors, such as Wolfson. As mentioned above, plaintiffs submitted a statement of facts in support of their motion for summary judgment. In statement of fact No. 27, plaintiffs stated that between November 2014 and December 2016, Wolfson loaned Play Ball at least $29,000. Plaintiffs also attached Wolfson's verified declaration, the functional equivalent of an affidavit,[6] in which Wolfson discussed the loans that he and one of his companies made to Play Ball. Knebelkamp responded to that statement of fact No. 27 with "Denied." Knebelkamp did not attach a counter affidavit or even cite to anything in support of that denial. See *Fitzpatrick*, 267 Ill. App. 3d at 391 ("Failure to oppose a summary judgment motion supported by affidavits or stipulations by filing counter-affidavits in response is fatal."); *Epstein v. Yoder*, 72 Ill. App. 3d 966, 972 (1979) ("[An] opponent's general denial *** is insufficient in itself to create a genuine issue of material fact.").

¶ 64    Knebelkamp has not submitted a single piece of evidence in support of his denial that Wolfson was a creditor of Play Ball. Accordingly, we accept Wolfson's statement that he was a creditor as true. See *Lindahl v. City of Des Plaines*, 210 Ill. App. 3d 281, 299 (1991). Under the plain language of the Limited Liability Company Act, it is undisputed that Wolfson, as both a creditor and member of Play Ball, was entitled to distribution at the winding up stage. Knebelkamp has not offered anything to suggest the contrary, so he has not created a genuine dispute as to this fact either.

---

[6]With his declaration, Wolfson filed a verification pursuant to section 1-109 of the Code of Civil Procedure, which provides: "Any pleading, affidavit, or other document certified in accordance with this Section may be used in the same manner and with the same force and effect as though subscribed and sworn to under oath, and there is no further requirement that the pleading, affidavit, or other document be sworn before an authorized person." 735 ILCS 5/1-109 (West 2024). Thus, we treat his declaration the same as an affidavit.

¶ 65 Finally, Knebelkamp contends that the real estate lease between Play Ball and Holste prevented the distribution of Play Ball's assets. However, Knebelkamp has waived this issue because he did not argue it in the circuit court. See *Johnson Press of America, Inc. v. Northern Insurance Co. of New York*, 339 Ill. App. 3d 864, 874 (2003) (" 'An argument not raised in the trial court and presented for the first time on appeal is waived, even in an appeal from a summary judgment.' " (quoting *Softa Group, Inc. v. Scarsdale Development*, 260 Ill. App. 3d 450, 452 (1993))). Because Knebelkamp did not raise this argument in the circuit court, he has waived it on appeal.

¶ 66 Based on the foregoing, we find that the circuit court did not err in its entry of summary judgment in plaintiffs' favor on count II.

¶ 67                                    2. Count III: Breach of Fiduciary Duty

¶ 68 Knebelkamp argues there are several disputes of fact that should have precluded the circuit court's grant of count III in plaintiffs' favor: (1) whether the evidence showed that Knebelkamp owed fiduciary duties after plaintiffs' withdrawal, (2) whether Knebelkamp presented facts to dispute this alleged breach, (3) whether plaintiffs established damages as they relate to rent and utilities, and (4) whether plaintiffs established any lost business opportunities.

¶ 69 Section 15-3 of the Limited Liability Company Act provides that a member of a member-managed LLC owes fiduciary duties of care and loyalty to the company. 805 ILCS 180/15-3(a) (West 2022). The duty of loyalty includes "account[ing] to the company and *** hold[ing] as trustee for it any property, profit, or benefit derived by the member in *** conduct[ing] *** the company's business[,] or derived from a use by the member of the company's property." *Id.* § 15-3(b)(1). It includes the obligation to act fairly when a member deals with the company in the conduct or winding up of the company. *Id.* § 15-3(b)(2). The duty of loyalty also includes

"refrain[ing] from competing with the company in the conduct of the company's business before the dissolution of the company." *Id.* § 15-3(b)(3).

¶ 70　To prevail on a claim for breach of fiduciary duty, plaintiffs must allege and ultimately prove (1) the existence of a fiduciary duty, (2) breach of the fiduciary duty, and (3) that such breach proximately caused the injury of which the party complains. *Indeck Energy Services, Inc. v. DePodesta*, 2021 IL 125733, ¶ 47.

¶ 71　Knebelkamp does not explain how his four alleged factual disputes relate to the elements of a breach of fiduciary duty claim. However, it appears that Knebelkamp's alleged factual disputes (1) and (4) relate to the existence of a fiduciary duty (element 1). Alleged factual dispute (2) relates to breach of fiduciary duty (element 2). Alleged factual dispute (3) relates to the injury aspect of element 3. For organizational purposes, we will discuss these alleged factual disputes within their corresponding elements.

¶ 72　　　　　　　　　　　　　　　a. Fiduciary Duty

¶ 73　Knebelkamp argues first that the evidence did not show that Knebelkamp owed fiduciary duties after plaintiffs' withdrawal. This is a question of law, not an issue of fact. The question is whether a member of a member-managed LLC continues to owe a fiduciary duty to other members after they have withdrawn, but not dissociated, from the company, which has not yet dissolved. The answer is yes: A member's duty of loyalty in a member-managed LLC includes the obligation to "refrain from competing with the company in the conduct of the company's business before the dissolution of the company." 805 ILCS 180/15-3(b)(3) (West 2022). Accordingly, Knebelkamp continued to owe fiduciary duties after plaintiffs withdrew.

¶ 74　Additionally, Knebelkamp asserts that plaintiffs have not established any lost business opportunities. Knebelkamp does not cite any authority for the apparent proposition that

establishing lost business opportunities is necessary prior to finding that a party has a fiduciary duty. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (The appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on.") That aside, Knebelkamp did not raise this argument in the circuit court. Thus, he has waived that argument on appeal. See *Johnson Press*, 339 Ill. App. 3d at 874 (Arguments not raised in the circuit court and presented for the first time on appeal are waived, even in an appeal from a summary judgment.)

¶ 75                                   b. Breach

¶ 76    Knebelkamp argues that he presented facts to dispute the alleged breach. Specifically, he contends that he adduced evidence that rebutted any assertion that he engaged in self-dealing when he increased the rent Dugout paid its landlord, Holste, which he owned. He now asserts that the increased rent amount resulted from the larger space Dugout leased (6,400 square feet to 22,400 square feet). See *supra* ¶ 12. Plaintiffs assert that Knebelkamp waived this argument, and we agree. The record indicates that, at summary judgment, Knebelkamp made this argument regarding whether the excess amount paid under the new lease was a valid measure of damages. He did *not* make this argument as to liability and has therefore waived it. See, *e.g.*, *McCullough v. Gallaher & Speck*, 254 Ill. App. 3d 941, 947 (1993) ("The scope of appellate review of a summary judgment motion is limited to the record as it existed at the time the trial court ruled."); *Rayner Covering Systems, Inc. v. Danvers Farmers Elevator Co.*, 226 Ill. App. 3d 507, 509-10 (1992) ("[U]pon appellate review of a summary judgment ruling the appellant may only refer to the record as it existed at the time the trial court ruled, outline the arguments made at that time, and explain why the trial court erred in granting summary judgment."). Accordingly, Knebelkamp has failed to create an issue of fact as to the breach of fiduciary duty element.

¶ 77                                    c. Damages

¶ 78    Finally, Knebelkamp argues that the circuit court lacked information to decide that plaintiffs incurred damages due to an increase in Dugout's rent amount. However, a review of the record indicates that plaintiffs did present such evidence. For instance, at summary judgment, plaintiffs showed that, under the lease with Dugout, Knebelkamp caused Play Ball's successor (Dugout) to pay an additional $11,000 per month to Holste, Knebelkamp's company. They supported this with citations to Play Ball's lease with Holste, Dugout's lease with Holste, Wolfson's declaration, and Knebelkamp's deposition. Based on the foregoing, plaintiffs argued that because the additional $11,000 was functionally a distribution out of Dugout to Knebelkamp's benefit, plaintiffs should have received half that amount, but they did not. Knebelkamp did not dispute this. As Knebelkamp never came forth with evidence to dispute plaintiffs' evidence, there is no issue of fact as to this element, either.

¶ 79    Based on the foregoing, we find that the circuit court did not err in its entry of summary judgment in plaintiffs' favor on count III.

¶ 80                          3. Count IV: Unjust Enrichment

¶ 81    In a heading in his brief, Knebelkamp contends that there is an issue of fact as to whether he was unjustly enriched. Unjust enrichment is a cause of action, not an issue of fact, and Knebelkamp does not explain how or why he was not unjustly enriched. Accordingly, we will not consider this unsupported argument. See *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 51 (2005) (We are not a depository in which an appellant may dump its undeveloped arguments without factual foundations in hopes that we will sift through the entire record to find something that helps the appellant's position.); *Travaglini v. Ingalls Health System*, 396 Ill. App. 3d 387, 405 (2009) ("It is not the responsibility of this court to scour the record in search of facts that support

the argument being advanced by a party." ). Knebelkamp has forfeited his unsupported argument.
See *In re Application of the County Treasurer & ex officio County Collector of Cook County*, 2025
IL App (1st) 240045, ¶ 29. Accordingly, we do not disturb the court's grant of summary judgment
on count IV.

¶ 82    In sum, we affirm the court's grant of summary judgment on counts II, III, and IV.

¶ 83                        B. Compensatory Damages

¶ 84    In their motion for compensatory damages, plaintiffs sought an award for Knebelkamp's
breach of his fiduciary duties to Play Ball. The court awarded plaintiffs $513,010.31, broken down
as follows: (1) $195,869.22, representing 50% of the increased rent paid by Dugout to Holste;
(2) $12,993.79, representing 50% of the amounts Dugout paid to Nicor Gas for Holste's benefit;
(3) $25,695.36, representing 50% of the amounts Dugout paid to Commonwealth Edison for
Holste's benefit; (4) $4,201.94, representing 50% of the amount Dugout paid to ADT Security
Services for Holste's benefit; (5) $53,750.00, representing 50% of the distributions Knebelkamp
paid himself through Dugout; and (6) $220,500.00, representing 50% of the value of Dugout, the
company's successor, as of September 2020, based on the opinion of plaintiffs' expert, Erin Hollis.

¶ 85    As best we can tell, Knebelkamp argues that there are two main questions of fact that
should have precluded the damages award here: (1) whether Play Ball's 2016 valuation or 2020
valuation should have been used, as plaintiffs allegedly dissociated from Play Ball in 2016, and
(2) how much Wolfson was entitled to receive.[7]

---

[7]Knebelkamp does not explain why he argues that the compensatory damages award was improper
under the summary judgment heading in his brief. The motion for compensatory damages is separate from
the summary judgment motion: plaintiffs filed their motion for compensatory damages a month after the
circuit court issued its decision on summary judgment. The court then issued a separate decision on
compensatory (and punitive) damages. Knebelkamp argues against the punitive damages award in a portion
of the brief separate from summary judgment, but he did not do the same for compensatory damages.

¶ 86                              1. Play Ball's Value and Dissociation

¶ 87    As to the alleged dissociation question of fact, Knebelkamp argues first that plaintiffs dissociated from Play Ball in 2016, so the correct measure of damages is what Play Ball was worth in 2016. According to Knebelkamp, Play Ball was worth nothing at that time, so damages would also have been zero. Knebelkamp does not explain or provide any support for his assertion that the correct valuation to use is the one at the time of dissociation. That aside, it is undisputed that plaintiffs did *not* dissociate in 2016.

¶ 88    First, Play Ball's tax returns for 2017 identified plaintiffs as "General partner[s] or LLC member-manager[s]" rather than "limited partner[s] or other LLC member[s]." It is undisputed that Knebelkamp prepared and signed those tax returns. There is no indication in the record that Knebelkamp ever introduced evidence to contest those facts. Further, Knebelkamp relies on the fact that plaintiffs demanded that he wind up Play Ball as evidence that they dissociated. Plaintiffs' attempts to convince Knebelkamp to wind up the company are irrelevant to their alleged dissociation because dissociation and dissolution are two different actions under the Limited Liability Company Act. Section 35-1 sets forth the events that would cause dissolution and winding up, while section 35-45 explains which events cause a member's dissociation. 805 ILCS 180/35-1, 35-45 (West 2022). If dissolution and dissociation were the same action, then every request to wind up a company would be treated as dissociation, but that is not what the Limited Liability Company Act contemplates. Rather, "[u]nder the [Limited Liability Company Act], members of a limited liability company have options for the dissociation of a member or dissolution of the company." *Hohlbaugh v. Hohlbaugh*, 2025 IL App (5th) 240826-U, ¶ 37. Moreover, even if the Limited Liability Company Act treated dissociation and dissolution the same, the undisputed evidence in this case shows that, at most, plaintiffs demanded, but did not

actually dissociate, as evidenced by the 2017 tax returns, the veracity of which Knebelkamp does not dispute.

¶ 89 Knebelkamp's second argument as to the alleged dissociation question of fact is that because Knebelkamp accepted a separation agreement and the parties co-edited a 2016 e-mail to Play Ball's customers, plaintiffs dissociated from the company. In support of this contention Knebelkamp cites to (1) plaintiffs' statement of facts and (2) an affidavit that he included with the submission of his motion for reconsideration.

¶ 90 We find Knebelkamp's reliance on plaintiffs' statement of facts incorrect and misleading. Nowhere in that document did plaintiffs state that Knebelkamp accepted a separation agreement. Rather, statement of fact No. 29 read: "Plaintiffs and Knebelkamp continued after December 2016 to *negotiate how* to wind up [Play Ball's] business." (Emphasis added.) In his response to the statement of facts, Knebelkamp *admitted* this statement of fact. That is, he agreed with plaintiffs. He cannot now take a contrary position to create a question of fact. See *Hansen v. Ruby Construction Co.*, 155 Ill. App. 3d 475, 480 (1987) (" '[A] party may not create a genuine issue of material fact by taking contradictory positions, nor may he remove a factual question from consideration just to raise it anew when convenient.' " (quoting *Schmahl v. A.V.C. Enterprises, Inc.*, 148 Ill. App. 3d 324, 331 (1986))). Having agreed with plaintiffs' statement of fact No. 29, there can be no dispute.

¶ 91 Knebelkamp's reliance on the affidavit he submitted for the first time with his motion to reconsider the summary judgment ruling is equally unavailing. He did not submit this affidavit with his original motion for summary judgment, only with his motion for reconsideration. As such, his affidavit is untimely and therefore not allowed. See *Brandenberry Park Condominium Ass'n v. Baligh Hassan Abu Taleb*, 2020 IL App (1st) 200442, ¶ 21 (On a motion to reconsider, an

affidavit " 'should not be allowed in the absence of a reasonable explanation of why it was not available at the time of the original hearing.' " (quoting *Delgatto v. Brandon Associates, Ltd.*, 131 Ill. 2d 183, 195 (1989))). Nothing in the record suggests that Knebelkamp ever attempted to provide a reasonable explanation of why the affidavit was not available at the time he responded to plaintiffs' motion for summary judgment. Thus, we disregard Knebelkamp's reference to the affidavit.

¶ 92    Based on the foregoing, we find there is no dispute of material fact as to whether plaintiffs dissociated from Play Ball in 2016 and whether Knebelkamp agreed to a separation agreement.

¶ 93                                        2. Wolfson's Damages

¶ 94    First, Knebelkamp asserts that there is a "glaring contradiction between [Wolfson's declaration] and deposition." In his declaration, Wolfson stated that Play Ball had approximately $75,000 in fixed assets at the time plaintiffs withdrew from the day-to-day operations of Play Ball in November 2016. In his deposition, he stated that Play Ball had just about $10,000 in equipment. For one, we do not see how the $75,000 figure is even relevant, as the circuit court did not use it as a basis for calculating plaintiffs' damages. Also, even if it were relevant, Knebelkamp has waived this issue, as he did not raise it in the circuit court. See *Johnson Press*, 339 Ill. App. 3d at 874 (Arguments not raised in the circuit court and presented for the first time on appeal are waived, even in an appeal from a summary judgment.).

¶ 95    Knebelkamp also argues that the circuit court should have taken into account Wolfson's $29,000 withdrawal from Play Ball to pay himself back for the loans he extended to it. As discussed above, it is undisputed that Wolfson was a creditor of Play Ball. As such, he was entitled to repayment. See 805 ILCS 180/35-10 (West 2022).

¶ 96    Second, Knebelkamp argues that Wolfson had to establish the value of Play Ball's name or trademark before being entitled to any damages. Knebelkamp did not raise this argument in the circuit court and has therefore waived it on appeal. See *Johnson Press*, 339 Ill. App. 3d at 874.

¶ 97    As there is no genuine dispute as to either dissociation or Wolfson's damages, the court did not err in its entry of compensatory damages.

¶ 98                              C. Attorney Fees/Punitive Damages

¶ 99    Knebelkamp also challenges the circuit court's award of punitive damages (as attorney fees), which totaled $187,119.67. It appears that his argument on this issue is two-fold: (1) punitive damages are not available in these circumstances as a matter of law, and (2) even if they are, the award was excessive. However, we will address only the first argument because the second argument is nothing more than a bare allegation in the statement of issues section of Knebelkamp's brief. He does not develop any argument as to this contention. See *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (We are entitled to have the "issues clearly defined and supported by pertinent authority and cohesive arguments; [we are] not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it [our obligation] to act as an advocate or seek error in the record.")

¶ 100   "The purposes of punitive damages are punishment of a specific defendant and both general and specific deterrence, and such damages will be awarded only where the defendant's conduct is willful or outrageous due to evil motive or a reckless indifference to the rights of others." *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1137 (2004). "Because punitive damages are not favored in the law [citation], they are available only in cases where the wrongful act complained of is characterized by wantonness, malice, oppression, willfulness, or other circumstances of aggravation." *Id.*

26

¶ 101   In reviewing a circuit court's decision to award punitive damages, we utilize a three-step analysis, considering (1) whether punitive damages are available for a particular cause of action, under a *de novo* standard; (2) whether, under a manifest weight of the evidence standard, the defendant acted fraudulently, maliciously, or in a manner that warrants such damages; and (3) whether the circuit court abused its discretion in imposing the damages. *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 355 (2009).

¶ 102   As to the first consideration, punitive damages are available for breaches of fiduciary duty (*Tully*, 409 Ill. App. 3d at 670) and claims for conversion (*Dubey*, 395 Ill. App. 3d at 355). Additionally, attorney fees and costs are available as punitive damages. *Talty*, 376 Ill. App. 3d at 1094 ("Attorney fees and costs are an element of punitive damages.").

¶ 103   Knebelkamp does not challenge the second consideration, so we presume the court's ruling on that was in accordance with the law. See *People v. Hillis*, 2016 IL App (4th) 150703, ¶ 106 (Under the presumption of regularity principle, absent a showing to the contrary by the appellant, we presume that the circuit court's ruling was correct.).

¶ 104   As to the third and final consideration, we do not find that the circuit court abused its discretion. The court does not abuse its discretion unless no reasonable person would adopt its view. *Wolkowitz v. Jamison*, 2024 IL App (1st) 230455, ¶ 34. We find that a reasonable person could find that plaintiffs deserved an award of punitive damages based on the breach of fiduciary duty and conversion claims. Thus, the circuit court did not abuse its discretion in awarding such damages.

¶ 105                                  III. CONCLUSION

¶ 106   For these reasons, we affirm the summary judgment ruling and damages awards of the circuit court of Cook County.

¶ 107   Affirmed.

*Wolfson v. Dugout Northbrook, LLC*, 2025 IL App (1st) 232257

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-3384; the Hon. Thaddeus Wilson, Judge, presiding. |
| **Attorneys for Appellant:** | Bert Zaczek and Amy Pikarsky, of Law Office of Bert Zaczek, of Chicago, for appellants. |
| **Attorneys for Appellee:** | David S. Americus, of Gozdecki, Del Giudice, Americus & Brocato LLP, and Ryan F. Manion, of Latimer LeVay Fyock LLC, both of Chicago, for appellees. |